UNITED STATES of America, Plaintiff–Appellee,

v.

Maria BENITEZ, Defendant–Appellant.

No. 95–2008.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 18, 1996.

Decided Aug. 9, 1996.

Barry Rand Elden, Chief of Appeals, David Rosenbloom (argued), Office of the United States Attorney, Criminal Appellate Division, Chicago, IL, for Plaintiff–Appellee.

James J. Cutrone (argued), Chicago, IL, for Defendant–Appellant.

Before COFFEY, DIANE P. WOOD and EVANS, Circuit Judges.

COFFEY, Circuit Judge.

Maria Benitez appeals her conviction and sentence for attempting to possess with the intent to distribute multiple kilograms of cocaine, in violation of 21 U.S.C. § 846. We affirm.

## I. Background

The government's investigation of Maria Benitez's drug trafficking activities arose from the work of a confidential informant, a former drug dealer named Tony Varela. In 1991, Varela was arrested by agents of the Drug Enforcement Agency while in possession of three kilograms of cocaine; Varela was charged and pled guilty to conspiring to sell cocaine (the exact terms of Varela's plea agreement are not in the record before the court). As part of a plea agreement to receive a reduced sentence, Varela agreed to assist the DEA as a confidential informant and participated in fifteen to twenty investigations, leading the DEA to his prior contacts as a drug dealer.

Varela was incarcerated in the Will County Jail in Joliet, Illinois, and was serving a sixteen-month term of imprisonment for his cocaine conviction. While incarcerated, Varela came in contact with Kevin Benitez, son of Maria (the record fails to reveal why Kevin Benitez was in the jail) and told him that he was a drug dealer. Kevin Benitez in turn introduced Varela to Maria by telephone

and Varela and Maria agreed to get together upon his release from confinement. Varela advised an agent from the DEA about the conversation and the agent instructed Varela to make contact with Benitez. The DEA arranged for Varela to be wired with a microphone for recording his conversations, as well as a listening device on his phone in order that his conversations with Maria would be recorded.

After his release in October 1993, Varela telephoned Maria Benitez on December 13 at her bar, the Estrella de Plata, in Chicago and they agreed to meet in the future at her tavern. Shortly after Varela dropped off his beeper number with one of her tavern employees in the morning, Benitez paged Varela and arranged to meet him later in the week. During the meeting, Benitez told Varela that she had just received five "blocks," which Varela understood to mean five kilos of cocaine. Benitez also advised Varela that the cocaine was not great quality, but Varela replied that the stuff he could get would be of a better quality. However, Benitez stated that she was not interested in purchasing at this time because there was too much police activity to make a purchase.

On February 19, 1994, Varela again met with Maria Benitez at the Estrella de Plata. In a conversation recorded by the DEA, Benitez discussed several individuals who had recently been arrested for drug dealing, including Rogelio Elisondo who upon being taken into custody was found in possession of 240 kilos of cocaine, as well as lamenting the risks of being robbed of large quantities of drugs. Varela stated that he was receiving a shipment of cocaine the following week and Maria asked the price; Varela replied that he could give her a good price. At that time, Maria Benitez stated that she did not trust certain suppliers, and she went on to recite the names of various individuals who had recently been murdered while engaging in the drug trade.

On February 25, 1994, Benitez paged Varela and the two talked again. In this recorded conversation, Benitez asked Varela whether he had any "horses" for her "ranch." Varela testified at trial that "horses" were a code word for kilos of cocaine, and that she

was really asking whether there was cocaine available for sale.[1] Varela told Benitez that "horses" were available and the two agreed to meet at the bar the following day for further discussions. Accordingly, the next day, Benitez and Varela conducted their meeting in the basement of the Estrella de Plata and discussed the price of the drugs.[2] On March 2, 1994, Varela called Benitez and let her know that he had "work" for the "ranch," meaning that he had available kilos of cocaine for sale. However, Benitez postponed the drug transaction, saying she was "too damn broke ... but maybe it will change later on." On March 5, Varela met Benitez at the bar. She told him that she had purchased "merchandise" (which, according to Varela, was another code word for cocaine), but it was too expensive. Varela offered to sell cocaine to Benitez on credit, giving her four kilos if she agreed to pay up front for two kilos. Benitez at this time advised Varela that she used to sell ten to twelve kilos a week before cocaine became so expensive, and now she was only able to move eight kilos a week. She displayed a letter to Varela that she had received from Oscar Aguilar, a drug dealer who was serving a prison sentence for possession of cocaine. Benitez informed Varela that Aguilar had been arrested while in possession of 38 kilograms of cocaine, but that 10 of those kilos were hers.

On March 10, 1994, Varela contacted Maria Benitez and invited her to his apartment in Justice, Illinois to inspect some "beautiful girls from Mexico." Varela testified that his reference to "girls from Mexico" was another code phrase for kilos of cocaine. Benitez agreed and stated she wanted to make sure that the girls were "clean," which meant that she wanted to ensure that the cocaine was of a high purity level. Unbeknownst to Maria, the apartment was owned by the DEA and was rigged with microphones and a hidden camera. On March 19, 1994, Varela picked up Benitez at the bar and drove her to the designated apartment. At the apartment, Benitez stated to Varela that she had people waiting with money and she could "push" fifteen a week, which Varela testified meant she could sell fifteen kilos of cocaine a week. Varela called his "brother-in-law" (in reality a DEA agent posing as Varela's accomplice), who brought a sample of Varela's cocaine to the apartment. Benitez inspected the cocaine by rubbing it between her fingers and determined that it was 94 percent pure (at trial the government testified that in fact the cocaine was 93 percent pure). After some further negotiation, Benitez finally agreed to pay Varela up front for two kilos of cocaine for $30,000 and in turn he would give her two more kilos on credit; Varela then drove Benitez back to the bar and arranged to meet with her later in the evening at the DEA apartment to consummate the drug deal.

That evening Benitez and Varela met at the DEA apartment. After Benitez and Varela reiterated the terms of the deal, Benitez produced a large paper bag stuffed with bundles of cash. As Benitez was counting out the money, DEA agents entered and arrested her.

A federal grand jury delivered an indictment against Benitez for attempting to possess with the intent to distribute multiple kilogram quantities of cocaine, in violation of 21 U.S.C. § 846. Benitez entered a plea of not guilty, and she contended at trial that she had been entrapped by the government into purchasing the cocaine. However, an undercover Chicago Police Officer (Alfonso Bautista) testified that during an investigation unrelated to the DEA's present investigation, he had posed as a drug dealer and had tape recorded Benitez negotiating the purchase of kilogram quantities of cocaine from him.

1. This court has frequently acknowledged that *drug dealers frequently use code words in an attempt to conceal the nature of their criminal conduct. See United States v. Kellum,* 42 F.3d 1087, 1090 n. 1 (7th Cir.1994) (observing that defendants, in recorded conversations, referred to packages of cocaine and heroin as "girls" and "boys," respectively); *United States v. Garcia,* 35 F.3d 1125, 1127 n. 3 (7th Cir.1994) (noting that a recorded conversation where the defendant discussed the sale of "two little zeros" was a coded reference to eight kilograms of cocaine).

2. This conversation was not recorded by the DEA because when Varela learned that his meeting was to be in the basement, he became nervous that he might be searched and so he removed the DEA microphone and hid it in his shoe.

These transcripts were read into the record at trial.[3] Additionally, in order to rebut her defense of entrapment, the government provided evidence that Benitez had been convicted in 1982 of conspiring to sell large quantities of heroin.

The jury convicted Benitez of the crime charged. After a sentencing hearing, the district court sentenced her to 168 months imprisonment, to be followed by 15 years of supervised release, and imposed a fine of $200,000 and a special assessment fee of $50. Benitez appeals her conviction and sentence.

## II. Analysis

### A. Jury Instructions

■ On appeal, Benitez argues that the district court committed reversible error in submitting an erroneous jury instruction regarding the defense of entrapment. However, the government points out that Benitez failed to make a timely, specific objection to the instruction as required by Rule 30 of the Federal Rules of Criminal Procedure.[4] Because Benitez forfeited her right of appeal on the jury instructions by failing to make a timely, specific objection, we review the trial court's instructions for *plain error* only. *United States v. Lakich,* 23 F.3d 1203, 1207 (7th Cir.1994); *United States v. O'Malley,* 796 F.2d 891, 894 (7th Cir.1986). Under the plain error doctrine, we have the discretion to reverse only where the trial court's error is clear, prejudicial, and affecting substantial rights. *United States v. Olano,* 507 U.S. 725, 732–35, 113 S.Ct. 1770, 1777–78, 123 L.Ed.2d 508 (1993); Fed.R.Crim.P. 52(b). Thus, even where the trial court has made an error, "the

Court of Appeals cannot correct the forfeited error unless the defendant shows that the error was prejudicial" and affected the outcome of the trial. *Id.* at 734, 113 S.Ct. at 1778. "The Court of Appeals should correct a plain forfeited error affecting substantial rights if the error 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'" *Id.* (quoting *United States v. Atkinson,* 297 U.S. 157, 160, 56 S.Ct. 391, 392, 80 L.Ed. 555 (1936)).

■ At trial, Benitez argued that the government agent, Tony Varela, had entrapped her into purchasing the cocaine. "The defense of entrapment consists of two elements: (1) government inducement of the crime, and (2) a lack of predisposition on the part of the defendant to engage in the criminal conduct." *United States v. Ellis,* 23 F.3d 1268, 1271 (7th Cir.1994) (citing *Mathews v. United States,* 485 U.S. 58, 63, 108 S.Ct. 883, 886–87, 99 L.Ed.2d 54 (1988)). The Supreme Court has described the defense of entrapment as follows:

> In their zeal to enforce the law, however, *Government agents may not originate a criminal design, implant in an innocent person's mind the disposition to commit a criminal act, and then induce commission of the crime so that the Government may prosecute.* Sorrells v. United States, 287 U.S. 435, 442 [53 S.Ct. 210, 213, 77 L.Ed. 413] (1932); *Sherman v. United States,* 356 U.S. 369, 372 [78 S.Ct. 819, 820–21, 2 L.Ed.2d 848] (1958). Where the Government has induced an individual to break the law and the defense of entrapment is

3. Benitez was not prosecuted for this crime because she called the deal off before taking any overt action that would constitute an "attempt" to purchase cocaine. Benitez, however, had displayed an active interest in the drug trade. Benitez had wanted the cocaine "fronted" by Bautista, that is, given to her on credit. Bautista testified that the Chicago Police Department had a policy of not giving drugs to dealers on credit and this is the reason the deal was terminated.

4. "No party may assign as error any portion of the charge or omission therefrom unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which that party objects and the grounds of the objection." Fed.R.Crim.P. 30. Benitez ar-

gues that she offered her own jury instructions as well as general objections to the government's instructions. However, upon review, we observe that the trial transcript fails to disclose any timely or specific objections by Benitez to the entrapment instructions. Benitez has thus forfeited the issue of whether the entrapment instruction was correct, for it is well settled that in the absence of a specific and timely objection, the submission of a jury instruction is insufficient to preserve the right to appeal. *United States v. Lakich,* 23 F.3d 1203, 1207 (7th Cir.1994) (citing *United States v. Bullock,* 857 F.2d 367, 371 (7th Cir.1988)). *See United States v. Roth,* 860 F.2d 1382, 1390 (7th Cir.1988) (observing that "[a]n objection must state grounds; 'I object' is not enough.").

at issue, as it was in this case, the prosecution must prove beyond a reasonable doubt that the defendant was disposed to commit the criminal act prior to first being approached by Government agents. *United States v. Whoie*, 925 F.2d 1481, 1483–84 (D.C.Cir.1991). Thus, an agent deployed to stop the traffic in illegal drugs may offer the opportunity to buy or sell the drugs, and, if the offer is accepted, make an arrest on the spot or later.

*Jacobson v. United States*, 503 U.S. 540, 548–49, 112 S.Ct. 1535, 1540–41, 118 L.Ed.2d 174 (1992) (emphasis added). Thus the government must prove that a defendant "was predisposed to violate the law before the Government intervened." *Id.* at 549 n. 2, 112 S.Ct. at 1541 n. 2.

Accordingly, the district court gave the jury the following instruction:

> One of the issues in this case is whether the defendant has been entrapped. A defendant who has been entrapped must be found not guilty. If the defendant had no prior intent or disposition to commit the offense charged and was induced or persuaded to do so by law enforcement officers or their agents, then she was entrapped. If, however, the defendant had a prior intent or predisposition to commit the offense charged, then she was not entrapped, even though law enforcement officers or their agents provided a favorable opportunity to commit the offense, made committing the offense easier, or even participated in acts essential to the offense.
>
> In determining whether the defendant had a prior intent or predisposition to commit the offense charged, you may consider the personal background of the defendant as well as the nature and degree of any per-

suasion of the defendant by law enforcement officers or their agents.

■ This instruction is, with minor modifications, identical to the Seventh Circuit Pattern Jury Instruction 4.04.[5] Nevertheless, Benitez argues that the instructions are erroneous because they failed to include the following specific language from *Jacobson*: "the prosecution must prove beyond a reasonable doubt that the defendant was disposed to commit the criminal act *prior to first being approached by Government agents*." 503 U.S. at 549, 112 S.Ct. at 1540. According to Benitez it was critical that the jury be instructed that the government must establish that Benitez was predisposed to selling drugs *prior* to her first meeting with Tony Varela. However, after reviewing the jury instructions in their totality, as we must, we are convinced that the issue of Benitez's predisposition to commit the crime was fully and properly presented to the jury; the instructions made clear that Benitez was to be found not guilty if she had "no prior intent or predisposition to commit the offense charged and was induced or persuaded to do so by law enforcement officers." Indeed, the instructions offered by the district court mirror the instructions we have previously approved. *Ellis*, 23 F.3d at 1273; *Lakich*, 23 F.3d at 1208–09. Accordingly, we hold that there was no plain error in the jury instructions as given dealing with Benitez's defense of entrapment.

## B. Fifth Amendment Right Not to Testify

Benitez alleges that the prosecutor made comments during closing argument that impermissibly prejudiced the defendant by violating her Fifth Amendment right not to

---

**5.** Seventh Circuit Criminal Instruction 4.04 provides:

> One of the issues in this case is whether the defendant was entrapped. A defendant who has been entrapped must be found not guilty.
>
> If the defendant had no prior intention or predisposition to commit the offense charged and was induced or persuaded to do so by law enforcement officers or their agents, then he was entrapped. If, however, the defendant had a prior intent or predisposition to commit the offense charged, then he was not entrapped

> even though law enforcement officers or their agents provided a favorable opportunity to commit the offense, or even participated in acts essential to the offense.
>
> In determining whether the defendant had a prior intent or predisposition to commit the offense charged, you may consider the personal background of the defendant as well as the nature and degree of any inducement or persuasion of the defendant by law enforcement officers or their agents.

testify at trial. The prosecutor's comments were as follows:

And as I talk about the specifics of this case, let me also ask you to do one thing, to keep in mind one principle as we go through this. Try to separate in your mind what she did and what she said before she was arrested with the explanations you now hear in court, and try to ask yourself to use your common sense which ones you can rely on more: the things she said and did when she didn't know the cameras were on and the tapes were running, or the explanations she gives to you, the jury, deciding her fate.

■ Benitez claims that the prosecutor erred by asking the jury to review her explanations as to the meaning of the code words she used in her conversations with Varela, such as "horses" and "girls." Benitez argues that because she did not testify at trial, the prosecutor was asking the jury to infer that her silence was an acknowledgment of the explanations of code-words offered by the government witnesses: that the words referred to illegal narcotics. However, during the prosecutor's allegedly improper remarks, Benitez *failed to make any objection*, much less a timely or specific one. Thus the issue has been forfeited and we review only for plain error. *United States v. Waldemer*, 50 F.3d 1379, 1385 (7th Cir.1995). The court of appeals has the discretion to reverse a forfeited plain error only when that error is clear, prejudicial and affecting the defendant's substantial rights. *Olano*, 507 U.S. at 732–35, 113 S.Ct. at 1777–78; Fed.R.Crim.P. 52(b). In Benitez's case, there is no plain error.

■ A prosecutor violates a defendant's Fifth Amendment right not to testify at trial by directly and adversely commenting on the defendant's failure to testify on his own behalf. *United States v. Butler*, 71 F.3d 243, 254 (7th Cir.1995) (citing *Griffin v. California*, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965)). Improper references to the defendant's decision not to testify occur when the defendant is able to establish that the prosecutor "manifestly intended" to refer to the defendant's silence, or when the statement was of such a character that the jury

could only interpret it to be a comment on the defendant's silence. *Waldemer*, 50 F.3d at 1385 (citing *United States v. Ramos*, 932 F.2d 611, 616 (7th Cir.1991)). However, to succeed on her claim, Benitez must prove that the prosecutor's comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986) (citation omitted). As this circuit has observed:

When analyzing allegations of prosecutorial misconduct during argument, we look at the disputed remarks in isolation to determine if they are proper. If the statements are proper, our analysis ends. If the statements are improper, our second step is to look at the remarks in light of the entire record to determine if the defendants were deprived of a fair trial.

*United States v. Reed*, 2 F.3d 1441, 1450 (7th Cir.1993) (quoting *United States v. Badger*, 983 F.2d 1443, 1450 (7th Cir.), *cert. denied* 508 U.S. 928, 113 S.Ct. 2391, 124 L.Ed.2d 293 (1993)). We have stated that five factors must be considered when evaluating the propriety of a prosecutor's comments:

(1) the nature and seriousness of the prosecutorial misconduct, (2) whether the prosecutor's statements were invited by conduct of defense counsel, (3) whether the trial court instructions to the jury were adequate, (4) whether the defense was able to counter the improper argument through rebuttal, and (5) the weight of the evidence against the defendant.

*Id.* We disagree with Benitez's interpretation of the prosecutor's remarks. Throughout the trial, in opening statements and during the cross-examination of witnesses, Benitez's counsel sought to portray Maria Benitez as an innocent dupe, badgered by the government agent into purchasing cocaine. To that end, Benitez's counsel attempted to characterize the tape recorded conversations where Benitez explained her drug sources and dealings as bar-room bravado, and tried to explain the references to "girls" and "horses" not as code words for cocaine, but innocent references to her employees and animals. Benitez's defense

went so far as to include the presentation of a witness who testified that Benitez owned horses and operated a ranch. The prosecutor's disputed remarks were nothing more than initial responses to Benitez's counsel's characterization of the coded evidence of drug dealing; the prosecutor pointed out that the defense's interpretation of the transcripts was inconsistent with the actual substance of the tape and video recorded conversations between Benitez and Varela. In light of the totality of the evidence received at trial and the explanations and excuses offered by defense counsel throughout the proceedings, it cannot be said that the prosecutor was clearly and adversely commenting on Benitez's right not to testify. *See United States v. Tipton,* 964 F.2d 650, 657 (7th Cir.1992) (observing that it is unreasonable to interpret a prosecutor's comments out of context in ruling whether the prosecutor inferred that a defendant's silence at trial should be used against him); *United States v. Sblendorio,* 830 F.2d 1382, 1391–92 (7th Cir.1987) (observing that prosecutors may "pursue evidentiary inferences for what they are worth."). Thus, we hold that there was no plain error in the prosecutor's statements.[6]

## C. Sentencing

The district court found that Benitez was responsible for 14 kilograms of cocaine, resulting in an offense level of 32 and, combined with her criminal history category of II, a sentencing range of 135 to 168 months imprisonment. Benitez appeals the calculation of her offense level.

▇▇▇▇ Section 1B1.3 of the sentencing guidelines directs a court to consider "relevant conduct" when calculating a defendant's base offense level. A defendant convicted of attempting to traffic in drugs should be held accountable for the quantity of narcotics that were "part of the same course of conduct or common scheme or plan as the offense of

conviction." U.S.S.G. § 1B1.3(a)(2); *United States v. Cedano–Rojas,* 999 F.2d 1175, 1178–79 (7th Cir.1993). "Thus, '[c]onduct that is not formally charged or is not an element of the offense of conviction may enter into the determination of the applicable guidelines sentencing range.'" *United States v. Hatchett,* 31 F.3d 1411, 1419 (7th Cir.1994) (quoting U.S.S.G. § 1B1.3, comment.). A drug trafficking defendant is responsible for the quantity of any negotiated drug deals, as long as she was reasonably capable of completing the transaction. *Cedano–Rojas,* 999 F.2d at 1179 (citing application note 1 of U.S.S.G. § 2D1.4); *Hatchett,* 31 F.3d at 1419. Further, any information may be properly used in sentencing, so long as it has "sufficient indicia of reliability" to support its probable accuracy. *United States v. Townsend,* 73 F.3d 747, 751–52 (7th Cir.1996).

▇▇▇ We review the district court's calculation of quantity of narcotics attributable to Benitez for clear error. *United States v. Taylor,* 72 F.3d 533, 542 (7th Cir.1995); *United States v. Vold,* 66 F.3d 915, 918 (7th Cir.1995). "We will reverse the sentencing court's determination of drug quantity only if we are left with a 'definite and firm conviction that a mistake has been made.'" *United States v. Berchiolly,* 67 F.3d 634, 638 (7th Cir.1995) (quoting *United States v. Corral-Ibarra,* 25 F.3d 430, 437 (7th Cir.1994)).

In sentencing Benitez, the district court initially determined that the applicable time period to be used to determine the quantity of drugs attributable to Benitez should begin from November 1992, the date that Tony Varela was introduced to Benitez's son and telephoned her from Will County Jail. Thus, any drug deals during this period are part of the same "course of conduct" as Benitez's offense of conviction. *See Cedano–Rojas,* 999 F.2d at 1180 (noting that whether a transaction forms part of the same course of conduct as the offense of conviction depends on the similarity, regularity and temporal

---

6. Benitez also claims, briefly, that in spite of the fact that she was represented by counsel throughout the trial, the district court was required to explicitly inform her of her right not to testify. However, this court has held that there is no constitutional requirement for a trial judge to ask the defendant whether she wants to testify

or not. *Underwood v. Clark,* 939 F.2d 473, 476 (7th Cir.1991). *See also United States v. Campione,* 942 F.2d 429, 439 (1991) (stating that "[c]ourts are not obliged to ascertain whether defendant's failure to testify is the result of a knowing and intelligent waiver of that right.").

proximity of the incidents in question). The district court found that the four kilograms of cocaine that Benitez attempted to purchase from Varela was attributable to Benitez as relevant conduct because it occurred as part of the offense of conviction. *See* U.S.S.G. § 1B1.3(a)(1)(A). That quantity of cocaine attributable to Benitez results in a base offense level of 30. *See* § 2D1.1(c)(5) (offense level of 30 for quantity of cocaine between 3.5 and 5 kilograms). Further, as part of the defendant's relevant conduct of sustained drug dealing, the government offered a myriad of additional evidence including the tape recordings of her conversations with Varela as well as the post-arrest statements of another drug dealer, Rogelio Elisondo.[7] For instance, in a tape recording of March 5, 1994 with Tony Varela, she stated that she could sell up to eight kilograms a week for him. In another recording, she tells Varela that she does not need to purchase drugs from him because she received 7 kilos the night before. Finally, in a transaction recorded in July 1993 by undercover officer Bautista of the Chicago Police Department, Benitez informed Bautista that she had 2 kilos in her possession and could sell between 5 and 6 kilos. Not only did the defendant admit to the possession of narcotics and plans for drug trafficking, she exhibited a wealth of knowledge and information regarding the illicit conduct of the drug business in Illinois, going so far as to be able to include many names of dealers, details of recent arrests and convictions, familiarity with the price for kilos of cocaine for the past several years, and an ability to predict the purity level of a cocaine sample merely by rubbing it between her fingers.

Finding Varela's testimony · reliable, the court found that Benitez had admitted to Varela that upon the arrest of Oscar Aguilar, the drug-dealer, ten of the kilos of cocaine that police discovered in his possession belonged to her. Thus, adding these ten kilos to the four that Benitez attempted to purchase from Varela results in a total of 14 kilograms—within the range for an offense level of 32. *See* § 2D1.1(c)(4). An offense level of 32, combined with Benitez's criminal history of II, yielded a guidelines range of 135 to 168 months imprisonment. The court sentenced Benitez to the maximum term of imprisonment, 168 months, stating:

> But the truth is what I have before me is a drug dealer, somebody who at [the] age of 44 dealt in heroin, someone who at the age of 55 or 54 dealt in cocaine. I am not willing to assume that this is an isolated incident. I am not willing to assume that this defendant will burn out or stop. I think we are dealing with what is a significant part of this defendant's business and way of life.
>
> I saw the videotape, I listened to the conversations, and I listened to all of the evidence at trial, and there is no question in my mind at all that this defendant is a drug dealer, and in it not for the short haul, but for the long haul; and in all honesty were it not for the combination of the sentence that I'm going to impose and the fact that this defendant is 57 years old today, I would seriously consider departing upward from the guideline that I have before me today, but I am not going to do that.

Although it is clear that the sentencing judge relied on the taped admissions of Benitez presented at trial to support his finding that Benitez was a long-term and well-informed drug dealer, the court failed to make *specific* findings on the record as to a number of other admissions of her drug dealing with others that Benitez made in her taped conversations received in evidence at trial, including but not limited to the conversation of March 5 with Varela and the statements made to officer Bautista.[8]

---

7. Elisondo had been arrested while in possession of 218 kilos of cocaine in 1993 and he had told police upon his arrest that the drugs belonged to Benitez. However, the district court chose not to attribute the 218 kilos of cocaine to Benitez as relevant conduct because Elisondo refused to testify at the sentencing hearing and the court was unwilling to sentence Benitez for over 200 kilos of cocaine based on merely one individual's post-arrest statements to the police.

8. We note that neither defense counsel nor the government requested the sentencing judge to make any specific findings in reference to the admissions Benitez made in her conversations with Varela that he (the judge) relied on.

However, on appeal, the government admits that in the sentencing material presented to the judge the date of Oscar Aguilar's arrest was mistakenly set forth as October *1993*, instead of the actual arrest date of October *1992*. The difference is significant because the district court found that the relevant time period for Benitez's crime began in November 1992, the date that her son met Tony Varela in prison and introduced him to the defendant Benitez. Thus, the ten kilograms Benitez admitted having ownership of from the Aguilar deal came from a period prior to and not involved in the relevant time frame.

As a result of the government's allowing the improper sentencing material to be entered into the record as to the mistaken dates of the Aguilar confession, Benitez argues that she is entitled to be resentenced and held responsible for only *four* kilos of cocaine. The government counters that the mistake in the date of the Aguilar transaction was harmless error because there is sufficient reliable evidence in the record, even discounting the ten kilos from Aguilar, to support the district court's finding that Benitez was responsible for at least five to fifteen kilos of cocaine. The government argues that because Benitez's offense of conviction included *four* kilos of cocaine, the reviewing court need only find reliable evidence of *one* more additional kilo of cocaine in the record to support the sentencing court's finding that the range of five to fifteen kilos was a most generous sentencing range for the defendant.

The Supreme Court has stated, in regard to the application of the sentencing guidelines:

[T]he party challenging the sentence on appeal, although it bears the burden of showing that the district court relied upon an invalid factor at sentencing, does not have the additional burden of proving that the invalid factor was determinative in the sentencing decision. Rather, once the court of appeals has decided that the district court misapplied the Guidelines, *a remand is appropriate unless the reviewing court concludes, on the record as a whole, that the error was harmless, i.e.,* *that the error did not affect the district court's selection of the sentence imposed.* *Williams v. United States,* 503 U.S. 193, 203, 112 S.Ct. 1112, 1120–21, 117 L.Ed.2d 341 (1992).

■■■■■■ Under *Williams,* "in order to avoid a remand we must conclude that the district court has not *relied* on the improper factor, at least not in a but-for outcome-determinative sense." *United States v. Jones,* 983 F.2d 1425, 1429 (7th Cir.1993). A reviewing court can be certain that an error in sentencing is harmless where the district court gives detailed reasons and findings that make clear that the court was not wholly relying exclusively on the improper material. *United States v. Mount,* 966 F.2d 262, 265 (7th Cir.1992); *cf. United States v. Dawson,* 1 F.3d 457, 465 (7th Cir.1993) (holding that district court's error was not harmless because the court relied on an improper factor in imposing an upward departure). Thus, an appellate court can affirm the determination of a sentencing range "on any ground supported by the record even if that ground was not relied upon by the district court." *United States v. Rivera,* 6 F.3d 431, 447 (7th Cir.1993) (quoting *United States v. Lincoln,* 956 F.2d 1465, 1470 (8th Cir.), *cert. denied,* 506 U.S. 891, 113 S.Ct. 259, 121 L.Ed.2d 190 (1992)); *United States v. Roederer,* 11 F.3d 973, 976 (10th Cir.1993) (affirming base offense level calculations of district court, even though court did not make specific findings, because court of appeals is "free to affirm a district court decision on any grounds for which there is a record sufficient to permit conclusions of law, even grounds not relied upon by the district court.") (quoting *Griess v. Colorado,* 841 F.2d 1042, 1047 (10th Cir. 1988)).

■■■■■■ With regard to the defendant's taped admissions and the overwhelming evidence of guilt concerning her extensive involvement in the drug trade, we note that the district court stated that: "I saw the videotape, I listened to the conversations, and I listened to all of the evidence at trial, and there is no question in my mind at all that this defendant is a drug dealer, and not in it for the short haul, but for the long haul." Thus, although the district court failed to

delineate specific findings as to each of Benitez's admissions presented to the court, it is rather obvious that his remarks at sentencing reveal that the transcripts and videotapes presented at trial convinced him beyond doubt that Benitez was a significant drug dealer. Thus, it is clear from the judge's comments at sentencing that he relied on Benitez's admissions to sentence her to the maximum within the range; indeed, were it not for Benitez's age (57), the judge stated that he would have given an upward departure from the sentencing range.

The defendant's offense of conviction was for the attempted purchase of four kilos of cocaine. Thus, the record need support only one more additional kilo of cocaine dealt by Benitez over the relevant time period in order to sustain the base offense level of 32. See § 2D1.1(c)(4) (base offense level of 32 requires finding that defendant was responsible for between 5 and 15 kilos of cocaine). In Benitez's case the record amply supports such a finding. As mentioned previously, Benitez admitted to Varela in tape recorded conversations of March 5, 1994 that she could sell up to eight kilos for him and that she already had seven kilos in her possession. Tape recordings were also played at trial that revealed, in July 1993, that Benitez told undercover officer Bautista that she was in possession of two kilos of cocaine and could sell up to six kilos. The district judge certainly found the evidence reliable, for he stated at sentencing: "I saw the videotape, I listened to the conversations, and there is no question in my mind at all that this defendant is a drug dealer, and not in it for the short haul, but for the long haul." Any one of the defendant's admissions alone, when added to the four kilos of cocaine that Benitez attempted to purchase from Varela, is adequate to support a finding that Benitez was responsible for the trafficking of at least five kilos. Thus, reviewing the record as a whole, including the unchallenged transcripts of Benitez's conversations with Varela and the district court's statements at sentencing, it is apparent that Benitez dealt in quantities of cocaine greater than five kilos (including the four kilos she attempted to purchase from Varela) over the relevant period of time. There is no question that the district court's selection of the sentencing range was proper and that the incorrect reference to the date of the Aguilar transaction was harmless error.

Since the district court's determination of the sentencing range is supported by the record, the final question is whether we can be certain that the court's sentence *within* that range (168 months) would be unaffected by the erroneous dating of the Aguilar transaction. In a similar situation, the Tenth Circuit has stated that an appellate court "will uphold a sentencing court's determination of drug quantity despite a court's error ... if, absent the court's error, it is clear beyond a reasonable doubt that the court would have imposed the same sentence." *United States v. Garcia*, 78 F.3d 1457, 1464 (10th Cir.1996) (citing *United States v. Hasting*, 461 U.S. 499, 509, 103 S.Ct. 1974, 1980, 76 L.Ed.2d 96 (1983) (observing that the "court has consistently made clear that it is the duty of the reviewing court to consider the record as a whole and to ignore errors that are harmless.")). In Benitez's case, from our review of the record, including the sentencing judge's statements, we are convinced that the district court, having selected the correct offense level, would have sentenced Benitez to the identical sentence: 168 months imprisonment. The sentencing judge stated in clear and unequivocal terms that he was imposing the maximum sentence within the range because of the defendant's long history of drug dealing. The Aguilar transaction was but one of many admissions that the court relied upon in making the statement that Benitez was a "long haul" drug dealer. Indeed, the judge did at one time consider applying an upward departure to give Benitez an even longer sentence, but declined to do so only because of her age (57). In light of the extensive evidence before the district court that Benitez was a career drug dealer, we are convinced that the judge would have selected the maximum sentence within the range whether or not the Aguilar transaction was included as relevant conduct. Thus, the erroneous dating of the Aguilar transaction was harmless error.

### III. Conclusion

The conviction and sentence of Maria Benitez are

AFFIRMED.