In the
United States Court of Appeals
For the Seventh Circuit

No. 99-2495

United States of America,

Plaintiff-Appellee,

v.

Roger D. Zehm,

Defendant-Appellant.

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 99-CR-1-S--John C. Shabaz, Chief Judge.

Argued January 4, 2000--Decided June 27, 2000

Before Cudahy, Kanne, and Diane P. Wood,
Circuit Judges.

Cudahy, Circuit Judge.

I) Facts

On January 6, 1999, a grand jury in the Western District of Wisconsin returned a four-count indictment against Roger Zehm, charging him with one count of conspiring with Trevor Christiansen to distribute methamphetamine from February 1998 until early April 1998 and one count of conspiring with Eric Brown to distribute methamphetamine from February 1998 until June 1998. Zehm was also charged with two counts of distributing methamphetamine--a total of 4.25 grams--to Cathy Lindstrom on April 29, 1998 and May 4, 1998. Police arrested Zehm on January 13, 1999. Pursuant to a plea agreement, Zehm pleaded guilty to counts 3 and 4, which involved the "retail" sales of methamphetamine. See Appellant's Appendix B at 4. The trial court dismissed counts 1 and 2, involving the Christiansen and Brown conspiracies, in which Zehm had allegedly made "bulk" purchases of methamphetamine and other drugs that he would subsequently sell to individual buyers.

Zehm admitted he had been in the business of dealing drugs for twenty years. See Appellant's Short Appendix at 7 (Trial Court "Statement of Reasons"). From the third week of February 1998 until early April 1998, Zehm purchased methamphetamine and cocaine from Trevor Christiansen. He always paid in cash. As a rule, Zehm purchased drugs from Christiansen at Christiansen's home. After making an initial quarter-ounce methamphetamine purchase from Christiansen, Zehm developed a routine in which he bought three-quarters of an ounce of methamphetamine every three days over a six-week period. Zehm purchased nine ounces of methamphetamine and one ounce of cocaine over the course of his relationship with Christiansen. From February 1998 until June 1998, Zehm also purchased methamphetamine from Eric Brown. Again, he began with a relatively small initial purchase (one ounce), and then developed a routine in which he bought two to four ounces of methamphetamine every other day. Zehm bought the drugs at Brown's home in Minnesota, and always paid cash. During the month of May 1998, Brown was imprisoned. Scott Wells, who supplied Brown with methamphetamine, sold directly to Zehm on Brown's behalf while Brown was incarcerated. According to the Presentence Investigation Report, Zehm purchased 81 ounces total from Brown and Wells. The district court explained that Zehm maintained multiple drug suppliers so that he would have a ready source of drugs even if a supplier occasionally was unavailable.

During the period Zehm was buying "bulk" quantities of methamphetamine from Brown, Wells and Christiansen, he was distributing the methamphetamine to individual drug users. Zehm lived in space adjacent to an auto repair shop owned by Joel Berg, and his rent payments consisted of methamphetamine rather than money. Russell Mork, a steady one-ounce per month customer of Zehm's, cooperated with the government after Zehm's arrest. He told the grand jury that he saw Zehm distribute methamphetamine to five people, and said he had been told that Zehm had been selling a quarter pound of methamphetamine every day for a month and a half. See Appellant's Appendix at 75 (Gov't Response to Presentence

Investigation Report, Attachment C, at 1).

In March 1998, while Brown and Christiansen were serving as two of Zehm's steady suppliers, Zehm met Cathy Lindstrom at a party. Lindstrom became a steady half-gram per week customer of Zehm's. In April 1998, police arrested Lindstrom for marijuana possession with intent to distribute. She cooperated with authorities, and made two controlled methamphetamine purchases from Zehm on April 29 and May 4. Zehm had purchased the methamphetamine sold to Lindstrom from a third supplier, Jeremy Baker.

On May 8, 1998, police executed a search warrant on Zehm's car. They found 14.6 grams of cocaine, 1.2 grams of methamphetamine, a loaded .32 caliber derringer, records of his drug sales to various individuals, $4,000 in cash and a cellular phone. Several of Zehm's customers, as well as Eric Brown and Trevor Christiansen, testified before the grand jury about Zehm's drug business. They furnished details about the quantity of Zehm's purchases and sales. The trial court relied on these statements in determining Zehm's sentence.

The trial court sentenced Zehm to two 240-month terms of imprisonment, running concurrently. In determining the sentence, the court included as relevant conduct the 4.25 grams of methamphetamine Zehm sold to Lindstrom on April 29 and May 8, to which Zehm had pleaded guilty. The court also included in Zehm's relevant conduct his "bulk" methamphetamine purchases from Brown, Wells and Christiansen, even though Zehm had not pleaded guilty to those counts. The court determined that the bulk purchases amounted to 90 ounces of methamphetamine. Zehm contends on appeal that these purchases should not be included as relevant conduct. Additionally, he argues that even if the trial court was entitled to account for his purchase from Brown and Christiansen, it miscalculated the total amount purchased by 75 ounces because it erroneously credited Brown's unreliable testimony. The trial court also denied Zehm's request for a three-level reduction for acceptance of responsibility. Zehm protests this denial. Finally, the trial court also

determined that the loaded gun found in Zehm's car warranted a two-level sentencing adjustment because Zehm possessed it during the commission of a drug offense. Zehm challenges these conclusions.

II) Analysis
A) Relevant Conduct

The Sentencing Guidelines instruct that a defendant's base offense level reflect the quantity of drugs for which the defendant is accountable. See United States v. Griffin, 194 F.3d 808, 826 (7th Cir. 1999), citing U.S.S.G. sec. 2D1.1. The base offense level must reflect not just the amount of drugs involved in the offense of conviction, but also the defendant's "acts and omissions . . . that were part of the same course of conduct or common scheme or plan as the offense of conviction." U.S.S.G. sec. 1B1.3(a)(2). We review for clear error the district court's application of the so-called "aggregation rule" to determine drug quantities attributable to relevant conduct, including both convicted and unconvicted offenses. See United States v. Bacallao, 149 F.3d 717, 719 (7th Cir. 1998). The government has a significantly lighter burden at sentencing than it had at trial, because it need only prove relevant conduct by a preponderance of the evidence, and relaxed evidentiary rules apply. See United States v. Crockett, 82 F.3d 722, 729 (7th Cir. 1996). As a measure of restraint, however, we insist that sentencing courts "explicitly state and support, either at the sentencing hearing or (preferably) in a written statement of reasons, the finding that the unconvicted activities bore the necessary relation to the convicted offense." See United States v. Beler, 20 F.3d 1428, 1432 (7th Cir. 1994), citing United States v. Duarte, 950 F.2d 1255, 1263 (7th Cir. 1991).

The government may prove the necessary link between the convicted and unconvicted offenses in two ways. It may argue that the offenses are part of a "common scheme or plan." U.S.S.G. sec. 1B1.3(a)(2). Or it may contend that the offenses are part of the same "course of conduct." Id. While these two formulations sound similar, they actually capture two distinct concepts. Offenses are part of a common scheme or plan if

they are connected by at least one common factor, such as "common victims, common accomplices, common purpose, or similar modus operandi." See Bacallao, 149 F.3d at 719, citing U.S.S.G. sec. 1B1.3(a)(2), Application Note 9. Offenses are part of the same course of conduct if they are "part of a single episode, spree, or ongoing series of offenses." Id. Courts assessing whether offenses are part of a course of conduct focus on whether the offenses were similar, regular, and close in time. See Bacallao, 149 F.3d at 719.

   In the present case, the trial court provided, as required by Beler, a written statement of reasons, in which it explicitly identified the basis for its finding that the unconvicted counts of bulk drug purchases from Christiansen and Brown were relevant conduct. See Appellant's Short Appendix at 7 (Statement of Reasons). It expounded on its reasoning at sentencing. See Sentencing Transcript at 19-20. The trial court found that the unconvicted drug purchases met both tests for relevant conduct. "Having multiple sources for his drugs he turned from Christiansen to Brown to Wells. His purpose remained the same--to secure drugs for himself and his customers . . . . Although defendant was not convicted of counts 1 and 2, the conduct embodied therein is included in the guideline computations because it was part of the same course of conduct or common scheme or plan as the offenses of conviction . . . ." Short Appendix at 7 (Statement of Reasons).

   Though it purported to find both a common scheme and a course of conduct, the trial court's written explanation identified just one relevant conduct factor, the common purpose driving the unconvicted drug purchases and the convicted drug sales. In its oral statement, the court identified the similar modus operandi throughout the period in question. Common purpose and similar modus operandi are factors suggesting a common scheme. Therefore, we will first review whether the trial court erred in finding that Zehm's offenses were part of a common scheme or plan. As the district court stated, Zehm admitted to having dealt drugs for two decades. Zehm appears to have been the quintessential middleman--purchasing wares in bulk from suppliers, and selling

them in retail quantities to individuals. Such "dealing" necessarily requires that the dealer both buy and sell drugs. Zehm could not, in other words, have completed the retail sales for which he was convicted without first acquiring drugs from a supplier. The trial court's brief explanation captured this essential reality when it referred to Zehm's sellers as drug "sources" and, in turn, to his drug "customers." Courts have recognized that purchases predating convicted sales may be considered relevant conduct. For instance, in United States v. Vital, 68 F.3d 114, 116 (5th Cir. 1995), the defendant was convicted of one count of possession with intent to distribute cocaine, after he sold 27.7 grams of cocaine to an undercover police officer. The Fifth Circuit let stand the trial court's decision to include as relevant conduct the convicted sale, a subsequent sale to the same officer one week later, and thrice-weekly purchases of cocaine made on the defendant's behalf in the month preceding the convicted sale. See id. at 116-18.

In the case now before us, Zehm admitted to a two-decade career as a drug dealer. Throughout the period in question, he had regular customers who scheduled routine drug purchases and therefore he could calculate the inventory required to meet demand. Cathy Lindstrom, whose two purchases gave rise to Zehm's conviction, purchased a half gram of methamphetamine from Zehm weekly. Russell Mork purchased one ounce of methamphetamine from Zehm every month, and testified that Zehm had been selling a quarter pound of methamphetamine daily for the six weeks prior to his arrest. Zehm even made his monthly rent payments in methamphetamine. This steady, predictable demand was fueled by a steady, predictable supply from Christiansen and Brown (and Brown's stand-in, Wells). Zehm purchased three-quarters of an ounce of methamphetamine every three days from Christiansen, and two to four ounces of methamphetamine every other day from Brown. The routine weekly sales to Lindstrom would not have been possible, in light of the high demand for Zehm's product, without the steady, reliable supply provided by Christiansen and Brown./1 Thus, a common purpose--maintenance of a high-volume drug distributorship--propelled both the convicted retail sales and the

unconvicted bulk purchases. Further, as the sentencing court noted, Zehm's modus operandi throughout the relevant time period was similar. He drove to the homes of his suppliers on a predictable, frequent schedule and paid in cash for small, fixed amounts of drugs. He then sold the drugs in regular quantities to repeat customers. Based on these two factors--commonality of purpose and similarity of modus operandi--the trial court did not clearly err in counting the purchases from Christiansen and Brown in Zehm's relevant conduct.

The trial court also concluded that the evidence was sufficient to prove that all the offenses were part of a course of conduct. The court's written explanation does not identify any factors supporting this conclusion. But at the sentencing hearing, the judge stated that "[h]e purchased methamphetamine from Christiansen, Brown, and then he resold the methamphetamine. All of this was the same course of conduct. . . . He purchased it from suppliers, whether it be Christiansen or whether it be Brown or whether it be a subsequent supplier. There was regularity, proximity between the counts of conviction and his methamphetamine dealing with Christiansen and Brown." Sentencing Tr. at 19. A course of conduct involves an ongoing series of offenses, and courts are to examine whether the offenses were similar, regular and close in time. See Bacallao, 149 F.3d at 719. For instance, in United States v. Benitez, 92 F.3d 528 (7th Cir. 1996), we affirmed the trial court's finding that the defendant had engaged in a "course of conduct" goingbeyond the offense of conviction; this extended conduct involved a four-kilogram cocaine purchase from a confidential informant. See id. at 539. During the two years the informant was in touch with the defendant, she had frequently discussed the demand for cocaine and the corresponding police surveillance of suspected drug dealers. See id. at 531-32. In addition to several stray remarks regarding her cocaine dealing, the defendant on one occasion remarked that she had seven kilograms of cocaine in her possession, and at another time estimated that she could sell up to eight kilograms in the near future. See id. at 537, 539. We concluded that the defendant's ability to calibrate her

cocaine purchases and likely cocaine sales indicated that the convicted purchase was part of a course of drug-dealing conduct. See id. at 538. We affirmed, finding that the defendant's revelations to the informant demonstrated a course of conduct involving at least five kilograms of drugs. See id. at 538–39. Similarly, in United States v. Townsend, 73 F.3d 747, 749 (7th Cir. 1996), a defendant pleaded guilty only to one count of drug possession. But the sentencing court heard evidence that he had been making biweekly drug deliveries to two distributors for the six months leading up to his possession offense, and we affirmed that the drug deliveries were sufficiently regular to amount to a course of conduct consistent with his possession conviction. See Townsend, 73 F.3d at 752.

Based on these precedents, we agree with the trial court that Zehm's drug purchases and drug sales were an ongoing series of offenses. Though buying and selling are, in a sense, dissimilar activities, they are structurally symbiotic. As in Benitez, we recognize that a mid-level drug dealer who simultaneously estimates impending demand and tries to procure an adequate supply is engaged in a course of conduct. One cannot sell drugs one has not procured. Further, the trial court in the present case correctly zeroed in on the regularity of Zehm's buys. He purchased every other day from Brown, and every third day from Christiansen. He routinely went to their homes to buy drugs, and always paid in cash. He sold drugs once a week to Lindstrom, once a month to Mork, and paid his rent in drugs, in addition to servicing other customers who apparently purchased a quarter-pound of methamphetamine daily. This metronomic scheduling is similar to the biweekly sales found regular in Townsend. Finally, the acts in this ongoing series of offenses were not just close in time, but virtually simultaneous. The relevant time period was February 1998 to June 1998; during that time Zehm bought drugs on alternating days from Brown and Christiansen, and from March to April, was selling drugs to Lindstrom. Though the trial court did not explicitly cite these facts when concluding that Zehm engaged in a course of conduct, the record amply supports that finding. In

sum, the trial court did not commit clear error in finding that Zehm's relevant conduct included the unconvicted Christiansen and Brown drug conspiracies.

Zehm protests the district judge's relevant conduct calculation on an additional ground. Even if the sentencing court was correct to include the Brown conspiracy, he argues, the court incorrectly calculated the drug quantity attributable to that conspiracy. The trial court determined that Zehm was responsible for 2.55 kilograms of metham phetamine, leading to a base offense level of 34 (reflecting responsibility for between 1.5 and 5 kilograms of drugs). Zehm admitted that he purchased nine ounces of methamphetamine from Christiansen. Additionally, the trial court found that Zehm purchased 81 ounces of methamphetamine in the course of the Brown conspiracy. Zehm counters that he purchased just six ounces from Brown. Again, we review the trial court's relevant conduct calculation for clear error. See Griffin, 194 F.3d at 827.

Zehm argues that the sentencing court erred by crediting Brown's allegedly unreliable testimony in order to arrive at the 81-ounce figure. Brown testified that he began dealing with Zehm in March 1998 and continued dealing with him until June 1998. Further, Lindstrom, Neely and Mork appeared to corroborate that Eric Brown was supplying large amounts of methamphetamine to Zehm on a regular basis. One witness reported that Zehm had been purchasing between $4,000 and $8,000 of methamphetamine regularly "from his source, Eric, in Little Canada, Minnesota." Presentence Investigation Report at par. 15. Further, even after supplier Christiansen's April arrest, witnesses stated that Zehm continued to have access to large quantities of drugs, suggesting that he had found an alternate supplier. Indeed, one witness stated that "Roger Zehm is getting [drugs] from Eric Brown as his source after Christiansen was arrested." Appellee's Br. at 23.

Zehm assails this evidence on many grounds. He argues that Brown is not a reliable witness because as the primary drug supplier in the alleged conspiracy, "he has the greatest incentive to fabricate." Appellant's Br. at 21. This

fabrication is evidenced, he argues, by the fact that Brown did not specifically state that he stopped dealing drugs to Zehm either while Zehm was jailed from May 6 to May 20, or when Brown was jailed from late May to June 12. It is axiomatic that the defendant has a due process right to be sentenced on the basis of reliable information. See United States v. Lanterman, 76 F.3d 158, 160 (7th Cir. 1996). But we have stated that the hallmark of reliability is consistency of facts and details. See United States v. Galbraith, 200 F.3d 1006, 1012 (7th Cir. 2000) (collecting cases). The testimony of just one witness, even a potentially biased witness, is sufficient to support a finding of fact. See Galbraith, 200 F.3d at 1012, citing United States v. Cedano-Rojas, 999 F.2d 1175, 1180 (7th Cir. 1993). We require only that the testimony be consistent, or that the trial judge provide an explanation for crediting one of the witness's inconsistent statements over the others. See Galbraith, 200 F.3d at 1013. For instance, when witnesses have given varying estimates of the amount of drugs they sold or purchased, we have not permitted the trial judge to credit one of the amounts without explaining why it was more believable than the others. See, e.g., United States v. McEntire, 153 F.3d 424, 436 (7th Cir. 1998); Beler, 20 F.3d at 1430-33.

In the present case, Brown's status as a government witness and alleged drug dealer does not sufficiently import bias so as to undermine the reliability of his testimony. Further, the "inconsistencies" Zehm targets are of no moment. The Presentence Investigation Report flatly contradicts Zehm's suggestion that Brown did not admit he ceased dealing drugs to Zehm during Brown's incarceration. It reports that "Brown stated that Graig Wells took over his business while he was in jail and started dealing to [Zehm]." Presentence Investigation Report at 6, par. 23. And while Brown did not specifically detail the two-week break in his dealing to Zehm while Zehm was in jail, he also did not explicitly state that he dealt drugs to Zehm during the period in question. Thus, Brown's account is not overtly inconsistent with reality. Zehm also charges that Brown incorrectly stated he began dealing with Zehm in March 1998, while one witness stated that

"Zehm is getting methamphetamine from Eric Brown as his source after Christiansen was arrested [in April]." Again, this statement is subject to interpretation. It could well have meant that although Brown was initially a minor supplier to Zehm, he expanded his role when Christiansen suspended business upon his arrest. In short, nothing said by Brown or witnesses corroborating his account was at odds with other witnesses, or with Zehm's version of events, and therefore we do not believe that Brown's testimony should be characterized as unreliable. The trial judge did not clearly err in crediting Brown's testimony or in calculating that Zehm had purchased 81 ounces of methamphetamine from Brown. We therefore affirm the trial court's relevant conduct calculation in its entirety.

B) Acceptance of Responsibility

Zehm asked the sentencing judge to decrease his sentence to reflect that he had accepted responsibility for his crimes, pursuant to U.S.S.G. sec. 3E1.1. That section provides that a defendant whose offense level is on par with Zehm's, and who "clearly demonstrates acceptance of responsibility for his offense" should receive a three-point decrease in his offense level. The commentary to this provision advises sentencing judges that they may consider factors such as

truthfully admitting the conduct comprising the offense(s) of conviction, and truthfully admitting or not falsely denying any additional relevant conduct for which the defendant is accountable under sec. 1B1.3. . . . A defendant is not required to volunteer, or affirmatively admit, relevant conduct beyond the offense of conviction in order to obtain a reduction under subsection (a). A defendant may remain silent in respect to relevant conduct beyond the offense of conviction without affecting his ability to obtain a reduction under this subsection. However, a defendant who falsely denies, or frivolously contests, relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility.

U.S.S.G. sec. 1B1.3, Application Note

1(a).

The judge denied the reduction, based on Zehm's challenge to the relevant conduct calculations. Zehm appeals this denial. We review for clear error a sentencing court's factual determination of whether a defendant has accepted responsibility. See United States v. Herrera-Ordones, 190 F.3d 504, 511 (7th Cir. 1999); United States v. Taylor, 72 F.3d 533, 550 (7th Cir. 1995).

We have previously withheld the acceptance of responsibility deduction from defendants who deny relevant conduct in the face of sworn statements from witnesses or coconspirators tying them to the offenses in question. For instance, in Taylor, 72 F.3d at 547-49, the sentencing court computed relevant conduct based on the Presentence Investigation Report. That report, in turn, relied on statements from "at least half a dozen individuals with first-hand knowledge of the drug-distribution network . . . who . . . gave largely consistent and mutually-corroborating accounts . . . [but] provided varying estimates of drug quantities." See id. at 543. The defendant challenged the relevant conduct calculation, denying the statements of witnesses and contesting the sentencing judge's application of the aggregation rule. The court subsequently denied the defendant a reduction for acceptance of responsibility, stating that while it is "perfectly appropriate" for a defendant to contest the amount of drugs, it was inappropriate to "deny frivolously" the extent of involvement in the conspiracy. Id. at 550. Because the defendant's story was wholly at odds with the statements of witnesses, the judge concluded that her denial was false and the reduction unwarranted.

Zehm's case squares exactly with Taylor. Zehm contested the judge's application of the aggregation rule, and denied responsibility for the full extent of his involvement in the Brown conspiracy in a statement wholly at odds with witness testimony. The sentencing court explained that the defendant had "falsely denied and frivolously contested relevant conduct which the Court has determined to be true," and therefore did not merit a sentence reduction. Zehm now argues that he never denied his part in the Brown or

Christiansen conspiracies, but merely challenged whether they were relevant to the offense of conviction. Had he restricted himself to such legal maneuvering, we might take a more favorable view of this matter. But he also challenged the amount of drugs attributable to the Brown conspiracy. As in Taylor, he offered only his bare denials to counter the largely consistent stories of several witnesses. The sentencing court did not clearly err in finding that Zehm's challenge was frivolous, and we therefore affirm its decision to deny the sentence reduction.

C) Possession of Dangerous Weapon

On May 8, 1998, four days after Zehm completed a controlled sale of methamphetamine to Lindstrom, a confidential informant told police that Zehm would be picking up about $8,000 worth of methamphetamine that evening. Police intercepted Zehm that night, and stopped his car. He denied police permission to search the car, but police obtained a warrant over the phone. They searched the car and found cocaine and methamphetamine, drug paraphernalia, $4,000 in cash and a .32 caliber gun with two live rounds of ammunition.

The district court explained in its written Statement of Reasons that it added two points to Zehm's base offense level because section 2D1.1(b)(1) of the Sentencing Guidelines requires an adjustment for possession of a firearm during an offense. Commentary to the provision states that "[t]he adjustment should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." Application Note 3. Section 2D1.1(b)(1) requires active or constructive possession of a firearm. See United States v. Griffin, 150 F.3d 778, 786 (7th Cir. 1998), citing United States v. Wetwattana, 94 F.3d 280, 283 (7th Cir. 1996). Constructive possession exists when a person exercises control over the firearm. See Wetwattana, 94 F.3d at 283. For instance, a defendant who sat in the back seat of a car next to a gun concealed in a tissue box was held to have possessed the gun. See id. And when police impounded a car and found drugs in the cargo area and a gun concealed in a briefcase on the floor of the front

passenger seat, we held that the defendant possessed the gun in connection with the drug offense. See Griffin, 150 F.3d at 786. Further, a defendant need not possess the gun during the offense of conviction, but may possess it during relevant conduct. See Wetwattana, 94 F.3d at 283, citing United States v. Anderson, 61 F.3d 1290, 1303-04. Thus, in United States v. Mumford, 25 F.3d 461, 468 (7th Cir. 1994), we affirmed a weapons enhancement for a defendant whose coconspirator carried a gun not during the transaction for which the defendant was convicted, but during other transactions considered to be relevant conduct. See also United States v. Price, 54 F.3d 342, 348 (7th Cir. 1995). We review the district court's upward adjustment of a sentence for clear error. See Wetwattana, 94 F.3d at 283.

The relevant conduct period in Zehm's case extended from February 1 until June 30. The Christiansen conspiracy ended on April 7, when Christiansen was arrested, but the Brown conspiracy continued. Thus, the Brown conspiracy was ongoing on May 8, the date the defendant was found to be in possession of the weapon. Moreover, the gun was found in close proximity to drugs, lending credibility to the trial court's determination that it was not clearly improbable the gun was possessed in connection with the drug offense. See Sentencing Tr. at 26. Further, according to the report of a confidential informant, Zehm was retrieving drugs from Minnesota when police searched his car and found the gun. Thus, as in Mumford, Zehm did possess the gun during the Brown conspiracy even though he may not have possessed it during the convicted sales to Cathy Lindstrom. The trial court did not clearly err in finding that Zehm possessed the gun during conduct relevant to the convicted offenses, and we affirm its decision to enhance Zehm's base offense level by two.

III) Conclusion

The trial court correctly analyzed and explained that Zehm engaged in the unconvicted conspiracy offenses as part of a scheme or plan and as part of a course of conduct common with the convicted drug sales. The trial court correctly found Brown's testimony reliable and rightly computed the amount

of drugs attributable to Zehm as a result of the Brown conspiracy. The court did not err by denying Zehm an acceptance of responsibility deduction, because it soundly determined that Zehm had frivolously contested the extent of his relevant conduct. Finally, the trial court properly enhanced Zehm's sentence by two levels to reflect the fact that he possessed a firearm during conduct relevant to the convicted offenses. We affirm on all grounds.

/1  Zehm contends that the methamphetamine he sold to Lindstrom in the convicted offenses was actually purchased from a third supplier, Jeremy Baker. Thus, neither Christiansen nor Brown was linked to the convicted sales, he argues. The provenance of Lindstrom's methamphetamine on the charged occasions is irrelevant. Zehm worked with several suppliers in order to satisfy demand in the Polk County, Wisconsin, area. Had he not dealt with Christiansen or Brown, the drugs he purchased from Baker might have been insufficient to cover all of his customers, including Lindstrom. So the Christiansen and Brown conspiracies were essential to the completion of the convicted sales to Lindstrom.