In the

# United States Court of Appeals
## For the Seventh Circuit

No. 14-3787

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

CHARLES TANKSON,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:13-cr-00269-1 — **Edmond E. Chang**, *Judge.*

ARGUED NOVEMBER 13, 2015 — DECIDED SEPTEMBER 12, 2016

Before POSNER, RIPPLE, and SYKES, *Circuit Judges.*

RIPPLE, *Circuit Judge.* Following an extensive sting operation by federal law enforcement of a drug distribution ring in Chicago, Charles Tankson was indicted on three counts of distributing 100 grams of heroin and one count of distributing a detectable amount of heroin, both in violation of 21 U.S.C. § 841(a)(1). He entered a written plea declaration without a plea agreement. At sentencing, the Government introduced Mr. Tankson's post-arrest statement to authorities in order to

establish significant additional drug quantities as relevant conduct. The district court credited the statement and, on the basis of the newly established drug quantities, both increased his offense level under the quantity table and determined that he was subject to the career offender guideline. The court calculated a guidelines range of 360 months to life but sentenced him below the applicable guidelines range to 228 months' imprisonment. Mr. Tankson now appeals his sentence. He challenges the district court's reliance on his post-arrest statement in determining his relevant conduct. He also contends that the court, in calculating his criminal history category, erred in including a 1995 conviction. We conclude that the district court was entitled to credit his statement and to consider the 1995 conviction. Accordingly, we affirm the judgment of the district court.

# I

## BACKGROUND

### A.

In 2012 and 2013, the FBI investigated a drug and gun trafficking operation headed by Walter Blackman, a member of the Black Disciples gang. Blackman's operation distributed heroin, powder cocaine, and crack in an area on the far south side of Chicago. The FBI's investigation employed confidential sources, controlled buys, wiretaps of Blackman's phones, traditional surveillance, and other information to uncover the scope of Blackman's activities and to identify the individuals involved in his network. In the course of this investigation, the FBI identified Mr. Tankson as Blackman's heroin supplier. On four occasions between November 2012 and January 2013,

the FBI became aware of transactions between Mr. Tankson and Blackman. Each involved at least 100 grams of heroin. The FBI intercepted calls arranging these purchases and surveilled or otherwise monitored the actual exchanges. On at least one occasion, Blackman resold the product to a confidential informant; subsequent testing confirmed the presence of heroin. In April 2013, Mr. Tankson was one of eighteen individuals arrested on charges related to Blackman's operation.

Once in custody, Mr. Tankson waived, orally and in writing, his right to consult with an attorney under *Miranda v. Arizona*, 384 U.S. 436 (1966). FBI Special Agents Ward Yoder and Joshua Rongitsch interviewed him on April 4, 2013. In the interview, he gave the agents significant details about his relationship with Blackman's operation. The interview was not recorded, but was summarized by the agents in a report drafted the following day.

Mr. Tankson told the agents that he and Blackman had grown up together and that both were members of the Black Disciples gang. He admitted to participating in the four transactions ultimately charged in the indictment and indicated that three of them involved 100 grams of heroin and that the fourth involved 150 grams. When agents played the taped conversations for Mr. Tankson, he identified his voice and Blackman's, explained code words, and described his transactions in detail. He identified a photo of heroin packaged and sold to Blackman. He also described his being stopped by law enforcement after a sale to Blackman in which the authorities had seized $3,500 in drug proceeds.

In addition to his statements about his relationship with and sales to Blackman, Mr. Tankson also gave statements about his own heroin suppliers and described more extensive

trafficking activities. He stated that he had sold marijuana growing up, but began selling powder cocaine and heroin after meeting "'a Mexican man'" at an auto repair shop near I-55 and Western Avenue in Chicago.[1] Although he described the shop as three blocks south of I-55 on Western, Mr. Tankson could not locate the shop on a map or provide any further detail. For a few months after their initial meeting, the "Mexican man" sold Mr. Tankson marijuana, and, when Mr. Tankson earned his trust, began selling him powder cocaine. Mr. Tankson admitted to purchasing roughly 1.5 kilograms of powder cocaine from this supplier, until the supplier was robbed of proceeds and subsequently ceased dealing drugs. The supplier then introduced Mr. Tankson to a second supplier, again at the auto repair shop.

Mr. Tankson met the second supplier only once. He described him as Mexican, short, thin, and with a short, black, military-style haircut. The two men communicated by T-mobile prepaid drop phones that were changed on a frequent basis at the supplier's request. When Mr. Tankson wanted to make a purchase, he would call the supplier's phone number and would be given a time and location for the buy. He recalled using a Mexican country code to place the calls, although he could not recall what the code was. He no longer had the phone with the second supplier's number in his possession because he had ceased heroin dealing three months earlier, after the police stopped him and seized the $3,500. Mr. Tankson stated that he would only place an order for as much heroin as he could sell on a specific day because he did not want to store any additional product. He estimated that

---

[1] R.48-3 at 3.

he placed 100 orders with this second supplier over two years, each for between 300 and 400 grams of heroin. He purchased the heroin at $6,500 per 100 grams, which he then resold at $8,000. The supplier changed couriers often, but they were generally other Mexican men in their forties, driving minivans with car seats or plain work trucks. Mr. Tankson said that the buys occurred in vehicles by window-to-window transactions at the Ford City Mall in Cicero, Illinois. He stopped all trafficking activity in January 2013, after the police stopped him with the proceeds of a sale to Blackman.

**B.**

On May 2, 2013, Mr. Tankson was charged in a four-count indictment with distribution of heroin in violation of 21 U.S.C. § 841(a)(1): three counts of distribution of 100 grams or more of heroin and one count of distribution of a detectable amount of heroin.

During his pretrial proceedings, Mr. Tankson filed a motion to suppress his post-arrest statement confessing to the charged offenses. He contended that he had not received adequate *Miranda* warnings and had not made many of the statements contained in the agents' report. Indeed, he testified that, in his numerous arrests, he never had been advised of his *Miranda* rights by any law enforcement officer. He admitted trafficking marijuana, but denied involvement in heroin trafficking. The court held a hearing at which Mr. Tankson and the interviewing officer, Special Agent Ward Yoder, each testified. Following the hearing, the court denied the motion and made a specific finding that Agent Yoder had testified credibly and Mr. Tankson had testified falsely. Accordingly,

it concluded that the Government had proved by a preponderance of the evidence that adequate warnings had been provided and that Mr. Tankson had knowingly waived them.

Two days before his trial was set to begin, Mr. Tankson entered a written plea on all charges, including admitting the factual basis for the four charged heroin sales. He was silent with respect to the remainder of his prior confession.

The presentence investigation report ("PSR") credited the post-arrest statement and concluded that Mr. Tankson had distributed 427.1 grams of heroin to Blackman and an additional thirty kilograms to other customers between 2011 and 2013. The PSR identified all of the sales as part of an ongoing pattern of conduct. Although his sales were not all related to Blackman and his particular ring, they all used a common accomplice (the second supplier) and an identical method and had an identical purpose. The probation officer concluded that the connections were sufficient to draw the additional thirty kilograms within the relevant conduct guideline, U.S.S.G. § 1B1.3(a)(2), which resulted in a base offense level of 38. The PSR also denied credit for acceptance of responsibility and instead applied a two-level enhancement for obstruction of justice because Mr. Tankson had lied about the extent of his criminal conduct in his suppression hearing testimony and had delayed his plea until the eve of trial. The PSR found that his 12 criminal history points qualified him for category V, but also found him to be a career offender under § 4B1.1(a) based on two predicate controlled substance convictions. His offense level was therefore 40, with a criminal history category of VI. The resulting Guidelines range was 360 months' to life imprisonment.

At sentencing, Mr. Tankson called Special Agent Yoder as well as a private investigator hired by the defense. The investigator testified that there were no auto body shops within the vicinity that Mr. Tankson identified in his post-arrest statement. On cross-examination, the prosecutor clarified that Mr. Tankson's statement had referenced an auto *repair shop*, and the investigator admitted that there was one such shop four blocks from the intersection of I-55 and Western Avenue. (Mr. Tankson had said three.) Mr. Tankson's counsel asked Special Agent Yoder numerous questions about the degree of follow-up given to the details of Mr. Tankson's statement, such as whether he had looked for a tire shop or tried to identify the suppliers or their phone numbers. Special Agent Yoder confirmed that they had not expanded their investigation of the Blackman enterprise and their existing thirty targets to include Mr. Tankson's suppliers. The agent said that the decision to circumvent the investigation was a resource issue. He did state, however, that he believed Mexican country codes had been located on the three or four phones seized from Mr. Tankson at the time of his arrest.[2]

Mr. Tankson's counsel argued that, because the relevant conduct had become the primary driver at sentencing, the court could use a higher standard of proof than preponderance of the evidence if it chose. He also contended that the Government had made no attempt to corroborate Mr. Tankson's statements in the post-arrest interview. Further, he argued that the standard is reliability, and "[j]ust because Mr. Tankson said it …, allegedly said it, if you find that he

---

[2] *See* R.157 at 43–44 (Sent. Tr.).

said it, doesn't mean it is reliable."[3] He also argued that a common scheme or plan is not established simply because the defendant engaged in other drug transactions, citing *United States v. McGowan*, 478 F.3d 800 (7th Cir. 2007).[4]

The Government argued that the information was reliable because Mr. Tankson's statement generally was corroborated. First, his criminal record showed a period of drug trafficking stretching back more than a decade. Second, various specific details were confirmed independently by other evidence including the cash amounts he claimed were involved, the drug quantities involved in the charged transactions, and the use of drop phones to contact his supplier. The Government also maintained that Mr. Tankson's ability to access large quantities of heroin in short periods of time suggested that he had an ongoing relationship with a supplier. Mr. Tankson's statements also matched his personal details regarding his wife, his parents, and his gang affiliation. In the Government's view, his truthfulness about these matters tended to suggest that he also spoke truthfully to the officers when he described his relationship with the suppliers and with Blackman. Finally, the Government submitted that because the statement was against his own interest it should be deemed more reliable.

The district court, using the preponderance standard, determined first that Mr. Tankson actually had made the post-arrest statement and that Agent Yoder had testified credibly about the interview. The court, noting that it already had

---

[3] *Id.* at 61.

[4] *Id.* at 63.

found at the suppression hearing that the procedures fol-
lowed by Agent Yoder were appropriate, also found the state-
ment reliable because it was given in a "noncoercive environ-
ment."[5]  In the court's view, that consideration increased the
reliability of the statement "because ordinarily people do not
make incriminating statements about themselves unless it is
true."[6] The court concluded that Mr. Tankson in fact did traf-
fic the thirty to forty kilograms of heroin set forth by the PSR.

Turning to the legal standard for relevant conduct, the
court concluded that it was "part of a common scheme or plan
or, at the very least, the same course of conduct."[7] The court
relied on the fact that it involved the same drug, from the
same supplier, over the same timeframe as the charged con-
duct.

Addressing Mr. Tankson's eligibility for the career of-
fender enhancement, the court looked at two Illinois con-
trolled substance convictions, including one for which
Mr. Tankson had completed his prison term in July 1997. Un-
der U.S.S.G. § 4A1.2(e)(1), a predicate offense can be counted
only if the offense or the defendant's incarceration for the of-
fense occurred within fifteen years of the present offense. De-
fense counsel argued that this earlier predicate was too old to
qualify because Mr. Tankson's release from prison had oc-
curred fifteen years and four months before the date of the
first charged offense. The court disagreed with this argument

---

[5] *Id.* at 77.

[6] *Id.*

[7] *Id.* at 79.

and counted both state offenses because the earlier state offense had occurred within fifteen years of the earliest *relevant conduct* related to the crime for which he was being sentenced. Accordingly, the court determined that the enhancement applied.

Finally, the court concluded that Mr. Tankson was not entitled to a reduction for acceptance of responsibility and instead would receive, on the basis of his false testimony at the suppression hearing, an enhancement for obstruction. Because of an amendment to the guidelines after the PSR was drafted, Mr. Tankson's base offense level was 36, and his total offense level was 38. The court determined that it was appropriate to sentence him as a career offender (criminal history category VI), but noted as well that, even without that device, his range at category V would be the same—360 months' to life imprisonment.

The Government requested a below-guidelines sentence of twenty years. Mr. Tankson requested the ten-year mandatory minimum. After reviewing the § 3553(a) factors, including Mr. Tankson's support of twelve children,[8] his criminal history, and his accountability for "an enormous quantity of a powerfully addictive and destructive drug" that translated to "tens of thousands of individual uses," the court imposed a below-guidelines sentence of nineteen years or 228 months'

---

[8] The written record of his post-arrest statement and the Government's brief in this case state that Mr. Tankson has eleven children. As Mr. Tankson's testimony at sentencing and the PSR make clear, he has twelve children. *Compare* Appellee's Br. 39, *with* R. 157 at 110.

imprisonment as well as both standard and special conditions of supervised release.[9]

Mr. Tankson now challenges whether the additional drug quantities accepted at sentencing were based on reliable evidence, whether those amounts were related to the offenses of conviction such that they were properly considered relevant conduct, and whether he was subject to the career offender enhancement.

## II

## DISCUSSION

Mr. Tankson challenges the portion of his sentence based on the additional relevant conduct found by the court, specifically, distribution of thirty additional kilograms of cocaine over the 400 grams involved in his offense of conviction. He contends that his post-arrest statement, memorialized in Agent Yoder's report, is neither reliable nor sufficient to carry the Government's burden. In any event, he continues, the statement does not establish the relationship to the charged conduct necessary to satisfy the relevant conduct guideline, U.S.S.G. § 1B1.3(a)(2).

The standards governing our review of sentencing questions are well established. A sentencing court must always "begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *Gall v. United States*, 552 U.S. 38, 49 (2007). As part of the proper guidelines calculation, when drug quantity is at issue, the sentencing court must make a

---

[9] R.157 at 112.

drug quantity finding. *See United States v. Cooper*, 767 F.3d 721, 731 (7th Cir. 2014); *United States v. Claybrooks*, 729 F.3d 699, 706 (7th Cir. 2013). We review the district court's quantity finding under the highly deferential clear-error standard. *Claybrooks*, 729 F.3d at 706; *United States v. Longstreet*, 567 F.3d 911, 924 (7th Cir. 2009).

## A.

We begin with Mr. Tankson's challenge to the statement's reliability.[10] In a shift from his position at sentencing, he no longer contends that the post-arrest statement, as reported by Special Agent Yoder, is not an accurate representation of his statements to authorities.[11] He now contends that his own voluntarily given statement, taken on its face, is not sufficiently

---

[10] Although Mr. Tankson's brief quotes *United States v. Morrison*, 207 F.3d 962, 968 (7th Cir. 2000), for the proposition that "[w]e will not allow the disparity between conduct disclosed at sentencing to enhance a defendant's sentence to the degree that the sentencing hearing becomes a tail that wags the dog of the substantive offense," Appellant's Br. 14 (internal quotation marks omitted), he does not contend that the district court could not base the sentence on a quantity derived primarily from relevant, as opposed to charged, conduct. *See United States v. Johnson*, 342 F.3d 731, 735–36 (7th Cir. 2003) (affirming sentence based on drug quantity calculation in which more than ninety-nine percent was based on relevant conduct and citing similar cases). He does not press in this court the argument, made in the district court, that his is "one of those rare instances" in which a standard of proof higher than preponderance is appropriate because of the "dramatic increase" in guidelines calculations caused by the relevant conduct. *Cf. id.* at 736. In any event, given the strength of the evidence here, this argument is without merit.

[11] Notably, at an earlier suppression hearing, the district court found that the statement was voluntarily given in a noncoercive environment and

reliable to form the basis for the district court's drug quantity findings.

A "defendant has a due process right to be sentenced on the basis of reliable information," *United States v. Zehm*, 217 F.3d 506, 514 (7th Cir. 2000), that is, on the basis of "information that has sufficient indicia of reliability to support its probable accuracy," *United States v. Smith*, 674 F.3d 722, 732 (7th Cir. 2012) (internal quotation marks omitted); *see also United States v. Johnson*, 489 F.3d 794, 798 (7th Cir. 2007). Nevertheless, the Government's burden at sentencing is substantially lower than at trial: the court is not limited to the evidence in support of the conviction and proved at trial or admitted in the plea; instead, the court must only find that a "preponderance of reliable evidence supports the drug quantity finding." *Cooper*, 767 F.3d at 731. We review the sentencing court's determination of reliability for an abuse of discretion. *See United States v. Mays*, 593 F.3d 603, 608 (7th Cir. 2010). We review the ultimate factual finding of the district court as to the quantity of drugs attributable to a defendant for clear error. *United States v. Block*, 705 F.3d 755, 759 (7th Cir. 2013).

In support of his argument that his statement is unreliable, and therefore cannot form the basis for the ultimate drug quantity finding, Mr. Tankson relies largely on *United States v. Robinson*, 164 F.3d 1068 (7th Cir. 1999), and *United States v. Morrison*, 207 F.3d 962 (7th Cir. 2000). But these cases are of no assistance to Mr. Tankson. His statement cannot be character-

---

had credited the statement and Agent Yoder's testimony in support of it. *See* R.113 at 157–58; R.157 at 77. The court also had concluded that Mr. Tankson's later testimony regarding the statement was false. *See* R.113 at 156–57.

ized as "patently unreliable." *Morrison*, 207 F.3d at 968 (characterizing a statement given in *Robinson*). More fundamentally, the statement at issue here is Mr. Tankson's *own* statement. By contrast, the statements in *Morrison* were drug-addict statements, utterances that "courts should carefully scrutinize." *Id.* at 968.

In *Robinson*, we reviewed a sentence based on the massive drug quantities derived from a single witness's statement. Although included in the PSR, this statement was untested by cross-examination and was not independently evaluated by the district court for credibility. We acknowledged that the district court was not required to hear from the witness, but stated that it was "not a terribly bad idea" when the statement was the support for such a significant proportion of the quantity. *Robinson*, 164 F.3d at 1070. More importantly, however, we noted that there were problems with the particular statement in *Robinson* that made it incredible on its face and that, consequently, the district court should have realized that it was necessary to scrutinize its reliability before allowing it to form the basis of the sentence. By contrast, in *Morrison*, we upheld a sentence where statements included in the PSR increased the defendant's drug quantity one hundredfold. 207 F.3d at 968–69. Although these statements came from several witnesses, who were drug addicts, the statements sufficiently corroborated one another and were each internally consistent.

In these cases, as in others, we have said that a district court should exercise caution when the Government seeks a long sentence on the basis of relevant conduct significantly greater than the charged offense. Several considerations lead us to believe that the district court exercised the requisite cau-

tion. First, Mr. Tankson's claim is much more akin to the objections that we reviewed in *United States v. Johnson*, 342 F.3d 731 (7th Cir. 2003). There, as here, the defendant challenged the reliability of his own post-arrest statement on drug quantity. In rejecting that challenge, we stated:

> Self-incriminating statements such as Johnson's, which was clearly against his penal interest, "have long been considered reliable enough for use at trial …, so we cannot say that they are too unreliable for use at sentencing." *United States v. Szakacs*, 212 F.3d 344, 352—53 (7th Cir. 2000). Indeed, we have held that a drug dealer's self-incriminating statement to a drug enforcement agent, which was offered at sentencing solely through the testimony of the agent (as opposed to a written confession or testimony by the dealer), was sufficiently reliable because "[n]o one was more qualified than [the dealer] himself to put a number on the amounts of cocaine he was purchasing and re-selling." *United States v. Contreras*, 249 F.3d 595, 602 (7th Cir. 2001).

*Johnson*, 342 F.3d at 734 (alterations in original). Moreover, we cannot accept Mr. Tankson's suggestion that the statement is not sufficiently corroborated because the Government did not identify any "enormous caches of money."[12] He points out that the quantity he attributed to himself, at the prices he identified, would have resulted in several hundred thousand dollars in profit. There was evidence in the record, however, of many potentially tainted assets: vehicles, property, and a

---

[12] Appellant's Br. 18.

$6,000 diamond-studded watch. In addition, Mr. Tankson supported twelve children and his parents. In any event, although evidence of an otherwise "unexplained, lavish lifestyle" may be admissible in a drug-related prosecution, *see United States v. Smith*, 308 F.3d 726, 737 (7th Cir. 2002), we have not required the Government to make such a showing.

Mr. Tankson has not identified any statement of his that is problematic or incredible on its face such that it should have given investigators pause and provoked a more thorough fact-checking of his own admissions. He simply submits that his statement was vague because although he recalled using drop phones and dialing a Mexican country code, he could not remember what numbers he had dialed. Although a statement's level of detail can bolster or reduce its reliability, *see Johnson*, 489 F.3d at 798, we cannot say that his statement was so lacking in detail as to be unreliable. It explains with sufficient specificity how Mr. Tankson developed his contacts and carried out his trafficking activities.

Mr. Tankson also asserts that that the Government produced no corroborating evidence of any of the additional, uncharged drug quantities, did not identify a single other customer, and did not attempt to corroborate his statements by visiting either the auto repair shop where he met his suppliers or the mall where he made his purchases. We already have rejected the general argument that the Government is required to corroborate a defendant's own statements in order to use them as the basis of a drug quantity calculation.[13]

---

[13] *See United States v. Contreras*, 249 F.3d 595, 602 (7th Cir. 2001) (specifically noting that there was "no independent evidence corroborating [the defendant's] post-arrest statement" and concluding that the court was still

Mr. Tankson's statement presents no occasion for an exception to that general rule. Indeed, Mr. Tankson's statement *has been corroborated* in important material respects. He was arrested on the basis of a sting operation, and his admissions match the facts as known to the officers. Although his statement extends well beyond those facts to other trafficking behavior, that additional behavior was consistent with the observed and known transactions. Finally, the statement was given voluntarily to the authorities.[14] Nothing in the record suggests a plausible reason why Mr. Tankson would have inflated his involvement in drug trafficking in his confession. The district court, therefore, did not abuse its discretion when it took Mr. Tankson's statement at face value. Consequently, its quantity calculation based on that statement certainly is not clear error.

**B.**

Mr. Tankson next contends that, even if the drug quantities are established sufficiently by his statement, the sales attributed to those quantities do not qualify as "relevant conduct" under the guideline. The district court's application of the guidelines provision concerning relevant conduct to the uncharged drug quantities is a factual issue that we review for clear error. *United States v. Delatorre*, 406 F.3d 863, 866 (7th

---

"not preclude[d] … from relying on it"). "The requirement of reliable evidence … is a limitation on the court's consideration of hearsay and other 'evidence with *uncertain provenance*.'" *United States v. Smith,* 674 F.3d 722, 732 (7th Cir. 2012) (emphasis added).

[14] *See* R.113 at 158 (hearing on Mr. Tankson's motion to suppress); R.157 at 77.

Cir. 2005).

The governing principles are well established. The relevant conduct guideline requires the sentencing court to aggregate, in calculating a base offense level, "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant" "that were part of the same course of conduct or common scheme or plan as the offense of conviction." U.S.S.G. § 1B1.3(a)(1)(A), (a)(2). As we have explained,

> [i]n *United States v. Duarte*, we noted that this "relevant conduct" or "aggregation rule" "grants the government a fearsome tool in drug cases. It permits prosecutors to 'indict defendants on relatively minor offenses and then seek enhanced sentences later by asserting that the defendant has committed other more serious crimes for which, for whatever reason, the defendant was not prosecuted and has not been convicted.'" 950 F.2d 1255, 1263 (7th Cir. 1991). However, the relevant conduct rule has limits. The rule allows sentencing courts to consider quantities of drugs not specified in the counts of conviction, provided "the unconvicted activities bore the necessary relation to the convicted offense."

*United States v. Ortiz*, 431 F.3d 1035, 1040 (7th Cir. 2005). In determining whether additional drug quantities are relevant,

> [t]he critical inquiry is whether the offenses are "sufficiently connected or related to each other as to warrant the conclusion that they are part

of a single episode, spree, or ongoing series of offenses." In making this determination, the court may look to the "similarity of the offenses, the regularity (repetitions) of the offenses, and the interval between the offenses."

*United States v. White*, 519 F.3d 342, 347 (7th Cir. 2008) (citation omitted).[15] We therefore have approved a sentencing court's

---

[15] More specifically, the application notes provide:

(9) "Common scheme or plan" and "same course of conduct" are two closely related concepts.

(A) <u>Common scheme or plan</u>. For two or more offenses to constitute part of a common scheme or plan, they must be *substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar <u>modus operandi</u>*. For example, the conduct of five defendants who together defrauded a group of investors by computer manipulations that unlawfully transferred funds over an eighteen-month period would qualify as a common scheme or plan on the basis of any of the above listed factors; <u>i.e.</u>, the commonality of victims (the same investors were defrauded on an ongoing basis), commonality of offenders (the conduct constituted an ongoing conspiracy), commonality of purpose (to defraud the group of investors), or similarity of <u>modus operandi</u> (the same or similar computer manipulations were used to execute the scheme).

(B) <u>Same course of conduct</u>. Offenses that do not qualify as part of a common scheme or plan may nonetheless qualify as part of the same course of conduct if *they are sufficiently connected*

decision to count all amounts that comprise a "continuous pattern of drug trafficking," *id.* at 348. *See, e.g.*, *United States v. Farmer*, 543 F.3d 363, 373 (7th Cir. 2008) ("Where the defendant's convicted offense was merely the latest drug sale in an unbroken series of deals regularly made, that is sufficient to find the defendant's prior drug transactions were part of the same course of conduct as the offense of conviction.").

Now that the governing principles have been set forth, we review precisely what Mr. Tankson's statement says about his

---

*or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses*. Factors that are appropriate to the determination of whether offenses are sufficiently connected or related to each other to be considered as part of the same course of conduct include *the degree of similarity of the offenses, the regularity (repetitions) of the offenses, and the time interval between the offenses*. When one of the above factors is absent, a stronger presence of at least one of the other factors is required. For example, where the conduct alleged to be relevant is relatively remote to the offense of conviction, a stronger showing of similarity or regularity is necessary to compensate for the absence of temporal proximity. The nature of the offenses may also be a relevant consideration (e.g., a defendant's failure to file tax returns in three consecutive years appropriately would be considered as part of the same course of conduct because such returns are only required at yearly intervals).

U.S.S.G. § 1B1.3 n.9 (2014) (emphasis added).

trafficking activity. He stated that he met his first heroin sup-
plier "about two years ago."[16] He then stated that he sold ma-
rijuana "[f]or a few months" until this supplier trusted him,
and then began selling heroin.[17] After the first supplier was
robbed, he was introduced to a second supplier. He described
their transactions as occurring over prepaid drop phones; he
called the supplier whenever he needed heroin, ordering only
as much as he could sell on a given day. During the call, he
received an instruction on the place to meet couriers (usually
the Ford City Mall). The report of his statement continues:

> Over the last two years, TANKSON estimated
> that he placed approximately 100 heroin orders
> from Mexican 2. TANKSON estimated that each
> of the 100 heroin orders was for approximately
> 300 grams to 400 grams of heroin. Mexican 2
> charged $6,500 per 100 grams of heroin and
> TANKSON sold the heroin for $8,000 per 100
> grams. … Mexican 2 changed his couriers often.
> The transactions with the couriers took place
> from their vehicles in the parking lot, window-
> to-window from TANKSON's car to the cou-
> rier[']s car. TANKSON provided money and
> picked up the heroin during the same transac-
> tion. TANKSON remembered Mexican 2 telling
> him that he needed to change vehicles and
> phones often to avoid law enforcement detec-
> tion, specifically wire taps and tracking devices.
>
> TANKSON ceased selling heroin following

---

[16] R.48-3 at 3.

[17] *Id.* at 4.

a law enforcement encounter when police seized approximately \$3,500.00 [Aforementioned TIII recordings surrounding 01/03/2013 transaction.] of narcotics proceeds from TANKSON …, because TANKSON thought the police were on to his narcotics sales.[18]

The district court found that the statement established that these transactions involved the same drug that he sold to Blackman during the same timeframe. As the Government notes, the statement also establishes a common accomplice (the second supplier), a common modus operandi (the way orders were placed, the size of the orders, the manner of pickups, and the pricing), and a common purpose of a large-quantity, high-turnover trafficking operation. Although Mr. Tankson now claims that we do not know when the 100 transactions with the second supplier took place, the only reasonable reading of his statement is that they took place with some regularity from the time he met the supplier until he stopped dealing after his encounter with law enforcement. The suggestion in his appellate brief that he may have had 100 separate transactions with the suppliers at the beginning of the two years on 100 consecutive days is an implausible reading of his statement. Moreover, even if it did represent a permissible view of the evidence, it would not justify reversal, especially under the clear error standard. *See Block*, 705 F.3d at 759–60; *United States v. Marty*, 450 F.3d 687, 690 (7th Cir. 2006).

We have looked skeptically at claimed relevant conduct that involves drug sales bearing little resemblance to these

---

[18] *Id.* at 4 (second bracketed material in original).

patterns. *See, e.g.*, *Ortiz*, 431 F.3d at 1041–42 (finding no relevant conduct when there was a ten-month gap between charged conduct and relevant conduct and where the offenses were not sufficiently similar because they involved different drugs, a smaller scale operation, and significantly smaller drug quantities).[19] This case presents no such situation. The evidence before the district court certainly justified the conclusion that Mr. Tankson had engaged in a continuous pattern of reselling drugs that he had acquired from the second sup-

---

[19] *See also United States v. Purham*, 754 F.3d 411, 414–15 (7th Cir. 2014) (finding two transactions, two years apart, lacking in common accomplices and modus operandi, were not sufficiently related for relevant conduct purposes, even though they involved delivery of same drug to same town); *United States v. Bacallao*, 149 F.3d 717, 721 (7th Cir. 1998) ("[T]he PSI establishes only one common element between the charged offense and the one-kilogram transaction: the relationship between Saunders and Bacallao. This link is not enough, standing alone, to show that the transaction was part of the same course of conduct or common scheme or plan as the offense of conviction. The record contains no evidence establishing, for instance, relevant dates, common victims, or details concerning the manner in which the kilogram of cocaine was acquired and distributed."). Nevertheless, we have not hesitated to count quantities when the necessary links exist. *See, e.g., United States v. Vaughn*, 722 F.3d 918, 932 (7th Cir.), *cert. denied*, 134 S. Ct. 541 (2013) ("When a substantial period of time exists between drug offenses without any intervening activity, it is possible to conclude that the defendant put his criminal activity on hold during that period of time. But where a defendant sells drugs, albeit to different purchasers, for an extended period of time with little or no break leading up to the charged offense, it is much more likely that the sales are part of the same common scheme or plan as the offense of conviction."); *United States v. Crockett*, 82 F.3d 722, 730 (7th Cir. 1996) (finding links established a common scheme or plan when there was a common accomplice, a common purpose to sell cocaine, and a common modus operandi of meeting in a restaurant and proceeding to another location to transfer drugs).

plier to individuals including Blackman. The relevant conduct determination is not clearly erroneous.

**C.**

Finally, Mr. Tankson challenges the district court's decision to apply the career offender enhancement of Guideline § 4B1.1(a). After calculating Mr. Tankson's base offense level, the district court, accepting the view in the PSR, determined that Mr. Tankson qualified as a career offender. We review the application of the guideline de novo. *United States v. Kindle*, 453 F.3d 438, 440 (7th Cir. 2006).

To attain career offender status under the guidelines a defendant must be eighteen years or older at the time of the present offense; that offense must be for a crime of violence or for a controlled substance offense, and the defendant must have two prior felony convictions of either a crime of violence or of a controlled substance offense. *See* U.S.S.G. § 4B1.1(a). Only prior felony convictions resulting in a term of imprisonment exceeding one year and one month may be counted. Moreover, the person's sentence must have been imposed within 15 years of the "commencement of the instant offense," or have resulted in the defendant being incarcerated during any part of the same 15 year period. *Id.* § 4A1.2(e)(1). According to application note 8 to § 4A1.2, "the term 'commencement of the instant offense' includes any relevant conduct." The PSR and the district court counted a 1995 offense for which Mr. Tankson was paroled in July 1997 because the relevant conduct for the present offense stretched back to January 2011. As

Mr. Tankson noted both here and before the district court,[20] this argument is entirely dependent on the court's conclusions with respect to relevant conduct. Because we have concluded that the district court did not clearly err in its relevant conduct determination, this argument is also without merit.[21]

## Conclusion

The district court did not abuse its discretion in determining that Mr. Tankson's voluntary post-arrest statement to the authorities was sufficiently reliable to establish the significant drug quantities attributed to Mr. Tankson at sentencing. Nor did the court clearly err in determining, on the facts before it, that those quantities fit within the relevant conduct guideline. Our determination that there was no reversible error on the relevant conduct issue necessarily forecloses an argument on the career offender enhancement. Accordingly, there was no error in the adjudication of Mr. Tankson's sentence. The judgment of the district court is affirmed.

AFFIRMED

---

[20] *See* Appellant's Br. 28–29; R.157 at 83.

[21] Moreover, as the district court noted, even without the increase to a criminal history category of VI, the applicable guidelines range for an offense level of 38 at criminal history category V would still have been 360 months to life. *See* R.157 at 88.