In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 19-1262 & 19-1911

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ROBERTA DRAHEIM and TOM LEWIS,

*Defendants-Appellants.*

Appeals from the United States District Court for the
Western District of Wisconsin.
Nos. 18-cr-00058-1 & 18-cr-00058-6 — **William M. Conley**, *Judge*.

SUBMITTED APRIL 9, 2020[*] — DECIDED MAY 7, 2020

Before BAUER, FLAUM, and KANNE, *Circuit Judges*.

FLAUM, *Circuit Judge*. Roberta "Mama Bear" Draheim was
a drug dealer in northern Wisconsin. Draheim's meth conspir-
acy was her proverbial cub. Between 2016 and 2018, she over-
saw the shipment of nearly forty packages of multi-pound

---

[*] We have elected to decide this appeal without oral argument as the
briefs and record adequately present the facts and legal arguments. *See*
Fed. R. App. P. 34(a)(2)(C).

quantities of methamphetamine from sources in California to La Crosse, Wisconsin. During this time, Draheim supervised at least eleven associates in her trafficking organization, including defendant Tom Lewis. Caught up in the conspiracy, both eventually pleaded guilty to certain narcotics offenses.

At sentencing, Draheim faced a mandatory-minimum sentence of ten years. She argued she qualified for "safety-valve relief," which would have authorized the district court to sentence her below the mandatory minimum. The court overruled Draheim's objection because she was the leader of her enterprise. Lewis contended that the court should only sentence him based on his conviction, not any other "relevant conduct." The court overruled his objection too.

Lewis and Draheim now appeal their sentences, maintaining that the district court's safety-valve and relevant-conduct decisions are wrong. We affirm the court's judgment in Draheim's case but vacate its judgment as to Lewis and remand for resentencing.

## I. Background

From October 2016 to February 2018, Roberta Draheim managed a meth conspiracy in northern Wisconsin. She and her organization were responsible for at least thirty-eight packages of methamphetamine (estimated to total a quantity in multiple pounds) sent from different locations in California to La Crosse, Wisconsin.

### A. Facts

In Wisconsin, Draheim supervised at least eleven associates who trafficked meth for her. Her associates called her "Mama Bear" and accepted shipments on her behalf, sent money transfers to California, distributed the meth, rented

storage lockers, and collected money owed to her. After Draheim directed an associate to accept a package of meth from California, for instance, she generally paid that associate to use his or her home address for future deliveries. In addition to her own addresses, Draheim utilized six others in greater La Crosse. She provided vehicles for her associates to drive across the area, and she herself drove two different cars for purposes of drug distribution.

Draheim put one associate in charge of renting storage lockers in his name, explaining that it was for her family's protection. She used the lockers to stash her meth, and in exchange, receive cash from her customers. On one occasion, Draheim told an associate that she found a substantial amount of meth in a locker that she forgot was there. The associate laughed, saying that it must be easy to forget when "you're dealing with six 'p' [pounds] at a time."

Draheim's organization did not have one syndicated payment method for the meth. Instead, Draheim used multiple forms, including Walmart-to-Walmart wire transfers, FedEx shipments, and U.S. Postal Service packages. On top of sending money in her own name, Draheim ordered her associates to transfer money in their names for her benefit.

At certain times, Draheim's network of traffickers included her daughter, who along with her two small children (Draheim's grandchildren), lived with Draheim. In August 2017, law enforcement officers caught Draheim's daughter facilitating a sale of over fifty-five grams of meth for her mother. Draheim reluctantly agreed to cooperate with the agents in their investigation. During her proffer interview, however, Draheim lied to the agents about her supplier and did not disclose other details of her operation. Soon thereafter, Draheim

resumed trafficking. As a result, the agents monitored her closely and placed a wiretap on her phone.

Throughout the conspiracy, the authorities seized several packages of meth en route to Draheim. In January 2018, agents seized 323 grams of pure meth from Draheim's California supplier. Subsequently, the supplier got cold feet and forced Draheim to find a new source. At this time, Draheim got in touch with Tom Lewis, one of her daughter's friends who was recently out of jail but still involved in the "meth scene." Draheim needed not only a new distributor for her organization, but also a personal dealer she could trust, seeing that many of her own associates were stealing money from her. Draheim had done business with Lewis in the past and knew he had a good relationship with her daughter. She therefore turned to him for help.

On January 27, a mere five days after his release, Lewis agreed with Draheim to purchase just under fifty grams of meth from a new supplier in California. Draheim told Lewis that if he gave her $400, she would split the meth evenly with him. Lewis planned to drop off the money at Draheim's house. She texted him, confirming the deal: "thanks for joining in with me." Lewis kept in touch with Draheim about the package's status. When it did not show up as expected, Draheim told Lewis that she was "freaking out." They apparently did not know that agents had already seized the package, which contained a little over half what they ordered: 28.6 grams of nearly pure meth, or "ice." Draheim and Lewis continued to anxiously wait for a package that would never arrive.

On February 4, while still expecting the package, Lewis and Draheim made a deal for her to drive him somewhere in

exchange for a gram of meth from him. Lewis said he would "hook it up like [he] did last night for [her]." Draheim asked for more than Lewis gave her the night before, specifically 1.75 grams (colloquially, a "T" or "half-ball") for $80. Lewis promised to stop by Draheim's place with the "half B" for $80. Draheim later admitted that she received approximately two grams of meth from Lewis that day. Lewis, for his part, conceded he went to Draheim's house three times.

On February 5, police arrested Draheim after they found her daughter dead at home from an overdose. Then, on February 8, the authorities took Lewis into custody for violating the terms of his state supervision just two weeks after his release from prison.

### B. Procedural History

In April 2018, a federal grand jury indicted Draheim, Lewis, and their codefendants with nine counts of meth distribution offenses in violation of 21 U.S.C. §§ 841, 846. Count IX charged that, on or about February 4, 2018, Draheim and Lewis knowingly attempted to possess with the intent to distribute a mixture or substance containing meth. Draheim pleaded guilty in October 2018 to conspiring to distribute and possess with the intent to distribute 500 grams or more of meth.

Shortly before trial, Lewis and the government agreed to resolve the case with a plea to a lesser charge. In February 2019, Lewis waived indictment and pleaded guilty to a one-count information, stipulating that he used a telephone to facilitate a drug crime in violation of 21 U.S.C. § 843(b). This offense carried a maximum penalty of four years in prison, as opposed to a maximum of twenty years under the crime

charged in the original (now dismissed) indictment. This information concerned entirely different conduct from the indictment. Specifically, it addressed Lewis's February 4 personal delivery of two grams of street meth to Draheim, not the 28.6 grams of ice sent from California. The district court sentenced Draheim in February 2019 and Lewis in May.

Draheim's Presentence Investigation Report (PSR) calculated her relevant conduct as involving approximately 783.6 grams of "ice" and 1,954 grams of a mixture of meth, covering eight transactions. This put her total offense level at 35, which included a two-point addition—one she did not object to—given her role as an organizer, manager, or supervisor in criminal activity under U.S.S.G. § 3B1.1(c). Draheim's criminal history score was zero, placing her in category I. The combination of the two calculations yielded an advisory Guidelines range of 168 to 210 months in prison. Based on the drug quantity, Draheim's mandatory-minimum sentence was 120 months under 21 U.S.C. § 841(a)(1).

The PSR stated that Draheim was not eligible for safety-valve relief, which would have allowed the district court to sentence her below the mandatory minimum. *See* 18 U.S.C. § 3553(f); *see also* U.S.S.G. § 5C1.2. All agreed that Draheim satisfied four of the five criteria for the safety valve: she did not have more than one criminal history point; she did not use violence or credible threats of violence or possess a firearm; the offense did not result in death or serious bodily injury; and she provided a truthful interview to the government.

Draheim objected to the PSR's recommendation against the safety valve, arguing she also satisfied the fifth and final requirement for relief: "the defendant was not an organizer,

leader, manager, or supervisor of others in the offense, as de-termined under the sentencing guidelines and was not en-gaged in a continuing criminal enterprise, as defined in sec-tion 408 of the Controlled Substances Act." 18 U.S.C. § 3553(f)(4); *see also* U.S.S.G. § 5C1.2(4) (same). Draheim con-tended that she qualified for the safety valve unless she was *both* a leader, supervisor, or organizer, *and* engaged in a con-tinuing criminal enterprise to not qualify for the safety valve. Draheim conceded she was a leader; however, she maintained her organization was not a continuing criminal enterprise and thus she remained eligible for relief.

The district court disagreed with Draheim's statutory in-terpretation and overruled her objection. The court explained that she could not be a leader or part of a continuing criminal enterprise to qualify for relief. The court relied on our deci-sions in *United States v. Syms*, 846 F.3d 230 (7th Cir. 2017), *United States v. May*, 748 F.3d 758 (7th Cir. 2014), and *United States v. Doe*, 613 F.3d 681 (7th Cir. 2010), to conclude that, be-cause Draheim was a leader, the fact that she did not engage in a criminal enterprise was irrelevant to its analysis.

In any event, the court indicated that the application of the safety valve would not impact Draheim's sentence. Her Guidelines range was above the mandatory-minimum sen-tence of 120 months, and "statutory or not" the court did not see itself sentencing Draheim to anything less than that. Cit-ing the scope and impact of Draheim's drug operation, with emphasis on Draheim's crucial role in it, the court sentenced her to 130 months in prison.

Turning to Lewis, his PSR calculated his base offense level as 26 based in part on his relevant conduct. This offense level accounted for the two grams of street meth that Lewis sold to

Draheim on February 4 (the basis for his conviction), and it also included the 28.6 grams of ice from the new California supplier that agents seized on January 31 (the basis of the original and now-dismissed indictment). After factoring in Lewis's acceptance of responsibility and criminal history category of IV, the Guidelines range was 70 to 87 months.

Lewis objected to the PSR's inclusion of the attempted import of California ice as relevant conduct, insisting that it was not part of the "same course of conduct or common scheme or plan as the offense of conviction" under U.S.S.G. § 1B1.3(a)(2). Lewis thus asserted that his offense level should be 12 because his conviction was only for the 2 grams that he delivered to Draheim. His corresponding Guidelines range would be 15 to 21 months. The PSR signaled that the seized 28.6 grams of California ice constituted uncharged or dismissed conduct, which counts as relevant conduct if it is part of the same course of conduct or common scheme.

The district court adopted the PSR's recommendation and overruled Lewis's objection. The court acknowledged that Lewis and Draheim "served different roles through their joint efforts to use and distribute methamphetamine, as well as possess it with intent to distribute." It reasoned that Lewis arranged both the 2-gram personal sale to Draheim and the seized order of 28.6 grams "through phone contact and texts, and each involved possession with intent to distribute and distribution of methamphetamine." The court therefore decided that the 28.6 grams fell "within the definition of relevant conduct in that it was a continuation of the defendant's practice of obtaining methamphetamine and repackaging it for sale."

The court sentenced Lewis to 36 months in prison, which was 34 months below the bottom of the Guidelines range of 70–87 months. That said, 36 months still eclipsed what Lewis's Guidelines range would have been, 15–21 months, had the court determined the 28.6 grams of ice was not relevant conduct.

These timely appeals followed.

## II. Discussion

Draheim and Lewis argue that the district court erred at sentencing when it overruled their respective safety-valve and relevant-conduct objections. We review the district court's interpretation of the safety-valve statute and Guidelines provision de novo. *See United States v. Collins*, 924 F.3d 436, 441 (7th Cir. 2019). The district court's application of the relevant-conduct guideline to a dismissed drug quantity is a factual determination that we review for clear error. *See United States v. Tankson*, 836 F.3d 873, 883 (7th Cir. 2016). We consider each challenge below.

### A. Safety Valve

When Congress passed the Mandatory Minimum Sentencing Reform Act of 1994, it simultaneously limited the application of mandatory minimums in certain cases in a provision known as the "safety valve." 18 U.S.C. § 3553(f). Following the legislature's lead, the Sentencing Commission added an analogous provision to the Guidelines. U.S.S.G. § 5C1.2. In so doing, Congress and the Commission recognized that mandatory minimums are inappropriate for some defendants, intending the safety valve "to benefit 'first-time, non-violent drug offenders who were not organizers of criminal activity and who have made a good-faith effort to cooperate with the

government.'" *United States v. Syms*, 846 F.3d 230, 235 (7th Cir. 2017) (quoting *United States v. Arrington*, 73 F.3d 144, 147 (7th Cir. 1996)).

The safety-valve statute provides that "the court shall impose a sentence … without regard to any statutory minimum sentence, if the court finds at sentencing, after the Government has been afforded the opportunity to make a recommendation, that—

> (1) the defendant does not have—
>
> > (A) more than 4 criminal history points, excluding any criminal history points resulting from a 1-point offense, as determined under the sentencing guidelines;
> >
> > (B) a prior 3-point offense, as determined under the sentencing guidelines; and
> >
> > (C) a prior 2-point violent offense, as determined under the sentencing guidelines;
>
> (2) the defendant did not use violence or credible threats of violence or possess a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense;
>
> (3) the offense did not result in death or serious bodily injury to any person;
>
> (4) the defendant was not an organizer, leader, manager, or supervisor of others in the offense, as determined under the sentencing guidelines and was not engaged in a continuing criminal

enterprise, as defined in section 408 of the Controlled Substances Act; and

(5) not later than the time of the sentencing hearing, the defendant has truthfully provided to the Government all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan, but the fact that the defendant has no relevant or useful other information to provide or that the Government is already aware of the information shall not preclude a determination by the court that the defendant has complied with this requirement.

18 U.S.C. § 3553(f). Section 5C1.2 of the Sentencing Guidelines includes essentially identical language. In this appeal, it is common ground between the parties that Draheim satisfies the first, second, third, and fifth criteria. The dispute concerns the fourth criterion.

As stated previously, Draheim contends that the district court needed to find that she was both a leader of others in the offense and engaged in a continuing criminal enterprise to disqualify her from safety-valve relief. Draheim depends heavily on Congress's choice to use the coordinating conjunction "and," and not the disjunction "or," to connect the leadership and criminal enterprise clauses. Generally, the joinder of two clauses with the word "and," not "or," means that the legislature intended that a potential candidate for statutory relief fulfill both clauses, not just one. *See Loja v. Main St. Acquisition Corp.*, 906 F.3d 680, 683 (7th Cir. 2018) (citing Antonin

Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 116 (2012) ("Under the conjunctive/disjunctive canon, *and* combines items while *or* creates alternatives."); *see also* 1A Norman J. Singer & J.D. Shambie Singer, *Sutherland Statutes and Statutory Construction* § 21:14 (7th ed. 2007) (similar).

The government disagrees, and the district court adopted the government's proposed interpretation, pointing to some of our safety-valve jurisprudence. *See Syms*, 846 F.3d 230; *United States v. May*, 748 F.3d 758 (7th Cir. 2014); *United States v. Doe*, 613 F.3d 681 (7th Cir. 2010). We agree with Draheim, however, that those cases do not resolve the issue because the parties did not present the specific issue to us for a decision one way or the other. In this Circuit, then, we are effectively writing on a blank slate. But this is not a matter of first impression across the courts of appeals because one of our fellow circuits has ruled on it, albeit several years ago. *See United States v. Bazel*, 80 F.3d 1140, 1143 (6th Cir. 1996).

In *Bazel*, the defendant asserted what Draheim does here: a defendant otherwise eligible for a sub-mandatory-minimum sentence under the safety valve still qualifies for relief if the defendant did not engage in a continuing criminal enterprise, even if the government demonstrates that the defendant was a leader of a criminal operation. 80 F.3d at 1141. The Sixth Circuit rejected the premise "that the use of the conjunctive 'and' in the statute and Guideline requires the government to prove both that Bazel was not an 'organizer, leader, manager, or supervisor' and that he was not engaged in a [continuing criminal enterprise]." *Id.* at 1142. The *Bazel* defendant (like Draheim) protested "that to deny the 'safety valve' to him if the court finds only one of these requirements

to be true is equivalent to judicially substituting the disjunctive 'or' for the conjunctive 'and.'" *Id.* at 1142–43.

The Sixth Circuit reasoned that the defendant's "argument would be correct if § 3553(f) or § 5C1.2 were phrased in terms of what the government would have to prove *was* true of the defendant, but unfortunately for [the defendant], the statute is phrased in terms of what the defendant must show *was not* true of him." *Id.* at 1143; *see also* Stacey M. Studnicki, *Federal Sentencing Guidelines*, 1997 Det. C.L. Mich. St. U. L. Rev. 625, 703 (1997) ("The statute is not phrased in terms of what the government would have to prove was true of the defendant; rather, it is phrased in terms of what a defendant must prove was not true of him.").

We find our sister circuit's textual analysis convincing and adopt its approach as our own for that reason and three others. *First* and foremost, it is consistent with our caselaw holding that a defendant must bear "the burden of establishing eligibility for the safety-valve exemption from a mandatory minimum sentence." *Collins*, 924 F.3d at 441. Understood accordingly, the defendant—not the government—must prove the defendant's entitlement to safety-valve relief by demonstrating "the defendant was not an organizer, leader, manager, or supervisor of others in the offense, … and was not engaged in a continuing criminal enterprise … ." 18 U.S.C. § 3553(f)(4).

*Second*, as noted by both the Sixth Circuit and us, "the legislative history of the statute and the Guideline[s] is clear. Section 3553(f) was intended to provide a 'safety valve' for mere drug 'mules'—carriers without significant leadership roles in a drug operation." *Bazel*, 80 F.3d at 1144; *see also Syms*, 846 F.3d at 235 (stating that Congress intended the safety valve "to

benefit first-time, non-violent drug offenders who were not organizers of criminal activity and who have made a good-faith effort to cooperate with the government." (citation and internal quotation marks omitted)). Here, as in *Bazel*, Draheim ran her own drug operation. She was not a "mule" or a low-level dealer. According to the safety valve's purpose, then, Draheim should not benefit from it.

*Third*, and finally, the Sentencing Commission's commentary reinforces the Sixth Circuit's and now our reading of the safety-valve provision. Specifically, Application Note 6 of § 5C1.2 states:

> "Engaged in a continuing criminal enterprise," as used in subsection (a)(4), is defined in 21 U.S.C. § 848(c). As a practical matter, it should not be necessary to apply this prong of subsection (a)(4) because (i) this section does not apply to a conviction under 21 U.S.C. § 848, and (ii) any defendant who "engaged in a continuing criminal enterprise," but is convicted of an offense to which this section applies will be an "organizer, leader, manager, or supervisor of others in the offense."

Draheim accepts that the commentary contradicts her statutory construction. Draheim nevertheless claims that a district court must find that the government showed both prongs of subsection (a)(4) apply. But that runs right into the Sentencing Commission's contrary interpretation, which observes that "[a]s a practical matter, it should not be necessary to apply [the continuing criminal enterprise] prong of subsection (a)(4) … ." U.S.S.G. § 5C1.2, cmt. n. 6. Construing subsec-

tion(a)(4) to require *the defendant* to establish both prongs harmonizes with the Commission's own comprehension of the effect (or lack thereof) of the provision.

The district court appropriately denied Draheim safety-valve relief from her mandatory-minimum sentence.

### B. Relevant Conduct

Moving on, we next address Lewis's objection to the district court's relevant-conduct determination. To calculate a defendant's base offense level under the Guidelines, "the sentencing court must consider types and quantities of drugs not specified in the counts of conviction but that were 'part of the same course of conduct or common scheme or plan' as the convicted offenses." *United States v. Ortiz*, 431 F.3d 1035, 1040 (7th Cir. 2005) (quoting *United States v. Beler,* 20 F.3d 1428, 1431 (7th Cir. 1994)). "'Common scheme or plan' and 'same course of conduct' are two closely related concepts." U.S.S.G. § 1B1.3(a)(2), cmt. n. 5(B).

"For two or more offenses to constitute part of a common scheme or plan, they must be substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar *modus operandi*." *Id.* cmt. n. 5(B)(i). The Sentencing Commission's commentary continues:

> Offenses that do not qualify as part of a common scheme or plan may nonetheless qualify as part of the same course of conduct if they are sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of of-

> fenses. Factors that are appropriate to the deter-
> mination of whether offenses are sufficiently
> connected or related to each other to be consid-
> ered as part of the same course of conduct in-
> clude the degree of similarity of the offenses, the
> regularity (repetitions) of the offenses, and the
> time interval between the offenses. When one of
> the above factors is absent, a stronger presence
> of at least one of the other factors is required.

*Id.* cmt. n. 5(B)(ii).

To be clear, relevant conduct does not "encompass any of-
fense that is similar in kind to the offense of conviction but …
does not bear the required relationship to that offense." *Ortiz*,
431 F.3d at 1040 (quoting *United States v. Patel,* 131 F.3d 1195,
1204 (7th Cir. 1997)). We have emphasized that the "mere fact
that the defendant has engaged in other drug transactions is
not sufficient to justify treating those transactions as 'relevant
conduct' for sentencing purposes." *United States v. Purham*,
754 F.3d 411, 415 (7th Cir. 2014) (quoting *United States v. Crock-
ett*, 82 F.3d 722, 730 (7th Cir. 1996)).

In this case, the district court did not expressly find that
the dismissed drug quantity qualified as part of a common
scheme or plan or the same course of conduct. Regardless,
"we may … affirm without a recitation of magic words that
reference [the Guidelines] if the record supports the district
court's conclusion." *United States v. Westerfield*, 714 F.3d 480,
488 (7th Cir. 2013) (citation and internal quotation marks
omitted). The court's explicit discussion of relevant conduct
highlighted that both transactions involved cell phones and
the possession with intent to distribute and distribution of
meth. It appreciated Lewis and Draheim's "different roles" in

their "joint efforts" to dispense meth. The way it saw things, the California ice order was a "continuation of the defendant's practice of obtaining methamphetamine and repackaging it for sale."

We do not share the district court's view. As an initial matter, cell phone usage is common, both within the drug trade and outside of it. On that ground, cell phone use does not strike us as a very compelling commonality or connection between the two transactions. It is also hard for us to understand how the California ice order was a "continuation" of any practice for Lewis when he had just gotten out of prison and this was the first deal of its kind for Lewis (and the first for Draheim from this provider).

Importantly, the district court needed to distinguish the nature of the two transactions. In one transaction, there was an individual sale of two grams of street meth in a city. In the other, there was a collaborative bulk order from the other side of the nation for nearly fifty grams of pure ice. Drug type and quantity matter when determining the scope of relevant conduct. *See United States v. Johnson*, 324 F.3d 875, 879 (7th Cir. 2003) (differentiating a large powder cocaine conspiracy from an individual sale of crack); *see also Purham*, 754 F.3d at 414 ("The 2008 transactions generally involved much larger amounts of cocaine than the 2010 transactions."); *Ortiz*, 431 F.3d at 1041–42 (finding no relevant conduct where the offenses were not sufficiently similar because they involved different drugs, a smaller scale operation, and significantly smaller drug quantities); *but see United States v. White*, 519 F.3d 342, 349 (7th Cir. 2008) (noting we do not require a non-charged offense to involve a drug identical to that in the offense of conviction).

A one-time order of a large amount of ice from a national distributor does not match up with a small sale of street meth to a local customer. *See United States v. McGowan*, 478 F.3d 800, 802 (7th Cir. 2007) (concluding that irregular purchases of significant amounts of cocaine from one person do not align with a sale of a small amount to another). Lewis's dismissed conduct was a drug scheme involving, as the district court put it, *joint efforts* to acquire a significant amount of ice, while Lewis's conviction was for "apparently acting alone to make an individual drug sale." *Johnson*, 324 F.3d at 880. Lewis's role, as the court comprehended it, "changed from one of many co-conspirators to lone dealer." *Id.*

Bearing this in mind, the fact that Draheim partook in both deals does not pack that great of a punch. Again, Draheim was Lewis's accomplice trafficker in the California ice order. She was, in a manner of speaking, a colleague. Conversely, in the Wisconsin street-meth deal, Draheim was Lewis's *customer*. She was effectively a different person given her "different roles." Lastly, these key distinctions are not overcome by the admitted closeness in time between the two transactions. Granted, only a week and a half separated the two deals. Lewis concedes, as he must, that such a short time span strongly favors similarity. Be that as it may, a similarity—such as the temporal proximity between these two sales—does not *ipso facto* make them related. *See Ortiz*, 431 F.3d at 1040. Hence, the timing is not enough on its own to support a relevant-conduct finding.

\*       \*       \*

It is important to underscore that "the relevant conduct or aggregation rule grants the government a fearsome tool in drug cases … ." *White*, 519 F.3d at 347 (citation and internal

quotation marks omitted). "It permits prosecutors to indict defendants on relatively minor offenses and then seek enhanced sentences later by asserting that the defendant has committed other more serious crimes for which, for whatever reason, the defendant was not prosecuted and has not been convicted." *Ortiz*, 431 F.3d at 1040 (citation and internal quotation marks omitted).

We have recognized important "limits" in this area of prosecutorial discretion to avoid abuse. *Id.* In this case, we conclude that the district court should not have added Lewis's dismissed drug quantities to his base offense level as relevant conduct, and its calculation to the contrary constitutes error.

### III. Conclusion

For the reasons explained above, we AFFIRM the district court's judgment in Draheim's case and VACATE AND REMAND its judgment as to Lewis for resentencing without the additional offense levels because his dismissed drug quantities are not relevant conduct under the Guidelines.